E-FILED
Friday, 28 March, 2025  10:32:36 AM
Clerk, U.S. District Court, ILCD

Law No. 22-cv-03268
5442-468 TMP/DAD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ROGHIEH GHOLAMI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Law No. 22-cv-03268-CRL-EIL |
| | ) | |
| BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MOTION FOR SUMMARY JUDGMENT

NOW COMES the Defendant, BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, by THERESA M. POWELL of HEYL, ROYSTER, VOELKER & ALLEN, P.C., its attorneys, and for its Motion for Summary Judgment pursuant to Federal Rule 56 and Local Rule 7.1(D) states as follows:

### I.  INTRODUCTION

Plaintiff filed a complaint on December 9, 2022, alleging discrimination under Title VII relating to her national origin as well as her sex.  Plaintiff also alleges that she has been subjected to retaliation. These three issues were referenced in Plaintiff's IDHR complaint filed in October of 2019.  Her claims relate to her rehiring which occurred in the spring of 2019.  Prior to that time, Plaintiff was employed at UIS from 2015 through 2018. Plaintiff was tenured in 2017, but then left UIS in 2018 and took a position in France. She decided to return to the U.S. to maintain her green card which required that she find employment. The only institution in the U.S. which offered her a position was UIS.  Plaintiff accepted the position and terms offered to her, but then filed her complaint shortly after alleging discrimination and retaliation.  Plaintiff's claims of discrimination

Law No. 22-cv-03268
5442-468 TMP/DAD

and retaliation are not supported by the evidence.  Accordingly, Defendant brings this Motion for

Summary Judgment as there are no genuine issues of fact for a jury to determine.

## EXHIBITS

| Exhibit No. | Description |
|---|---|
| UIS Produced 1-4 | IDHR Charge of Discrimination |
| UIS Produced 29-32 | Article 6 Promotion of Personnel Policy Provisions |
| UIS Produced 40 | Email dated 4/9/2019 from Dean Bhattacharya to GHOLAMI offering employment and GHOLAMI accepting terms of employment offer |
| UIS Produced  52-53 | UIS letter dated 5/3/2019 to GHOLAMI setting forth employment offer and GHOLAMI signature of acceptance of terms dated 5/12/2019 |
| UIS Produced 54-55 | UIS Notification of Appointment to Gholami re Associate Professor tenure effective 8-16-2019 |
| 1 | Transcript of Deposition of Roghieh Gholami taken 9-8-2023 |
| 2 | Transcript of Deposition of Dennis Papini taken 11-14-2024 |
| 3 | Transcript of Deposition of Dean Somnath Bhattacharya taken 11-12-2024 |

## II. UNDISPUTED MATERIAL FACTS

**A.  Statements from Deposition of Roghieh "Roya" Gholami taken 9-8-2023**

1.  The Plaintiff, Roghieh "Roya" Gholami (hereinafter "GHOLAMI"), is currently employed at University of Illinois-Springfield (hereinafter "UIS" or "university").  (Ex. 1, 5:20-22).

2.  GHOLAMI has been working at UIS since August of 2019.  (Ex. 1, 5:23-6:4).

3.  Prior to 2019, GHOLAMI also worked at UIS from 2015 to 2018.  (Ex. 1, 6:2-8).

4.  GHOLAMI was a UIS Associate Professor from 2015 to 2018. She had recently been granted tenure in 2017 just prior to her resignation.  (Ex. 1, 6:12-17).

5.  In 2018, GHOLAMI left and went to France.  (Ex. 1, 6:9-11).

Law No. 22-cv-03268
5442-468 TMP/DAD

6.      GHOLAMI decided to leave France and return to the United States in order to maintain her immigration status.  (Ex. 1, 36:19-37:15).

7.      GHOLAMI does not recall the exact number of institutions she applied to upon deciding she wanted to leave France.  (Ex. 1, 39:3-24).

8.      GHOLAMI admits that all of the institutions she did apply to after deciding to leave France were within the United States.  (Ex. 1, 39:13-17).

9.      Only UIS offered GHOLAMI a position.  (Ex. 1, 40:7-9).

10.     Since returning to UIS, GHOLAMI has not applied for any other positions.  (Ex. 1, 42:14-16).

11.     GHOLAMI's citizenship is British.  (Ex. 1, 42:17-19).

12.     When GHOLAMI came to UIS in 2015, she was a British citizen at that time as well.  (Ex. 1, 42:8-11).

13.     GHOLAMI asserts that the MIS department head from 2015 to 2018 was also Iranian and knew she was Iranian.  (Ex. 1, 43:12-22).

14.     GHOLAMI spoke to Dr. Hadidi in Farsi.  (Ex. 1, 44:1-4).

15.     GHOLAMI believes that people were familiar with the fact that she was Iranian.  (Ex. 1, 44:13-45:12).

16.     GHOLAMI admits that no one said anything negative about her being from Iran.  (Ex. 1, 45:9-12).

17.     When GHOLAMI decided to leave France, the first person she contacted at UIS about her return was Provost Papini.  (Ex. 1, 45:20-46:1).

Law No. 22-cv-03268
5442-468 TMP/DAD

18.    Prior to reaching out, GHOLAMI's only contact with Provost Papini had been her exit interview in 2018.  (Ex. 1, 46:16-19).

19.    GHOLAMI admits that she did not really know Provost Papini at the time.  (Ex. 1, 46:20-23).

20.    At the time of her exit interview with Provost Papini, GHOLAMI had no personal knowledge to know what he knew or didn't know about her.  GHOLAMI did not know him.  (Ex. 1, 47:19-48:13).

21.    GHOLAMI's claim of harassment involving Dr. Hadidi relates to a date in 2016 when he asked her to go to lunch with him.  (Ex. 1, 76:16-21; pages 75-79 generally; 78:6-7).

22.    GHOLAMI claims that Dr. Hadidi stared at body parts.  (Ex. 1, 81:16-19).

23.    GHOLAMI did not say anything to Dr. Hadidi when she observed this.  (Ex. 1, 81:23-82:1).

24.    GHOLAMI admits that Dr. Hadidi did not promise her anything during this lunch.  (Ex. 1, 83:13-15).

25.    GHOLAMI decided to leave France sometime after her first semester teaching there.  (Ex. 1, 110:1-5).

26.    Shortly thereafter, GHOLAMI decided that she wanted to return to the United States.  (Ex. 1, 110:6-8).

27.    GHOLAMI agrees that she would not have taken a job outside of the United States because she was planning to come back to the United States.  (Ex. 1, 110:9-16).

28.    GHOLAMI admits that Provost Papini indicated to her that he would serve as a positive reference for her.  (Ex. 1, 111:1-23).

Law No. 22-cv-03268
5442-468 TMP/DAD

29.      GHOLAMI agrees that she first inquired or reached out to Provost Papini about being a reference on February 7, 2019.  (Ex. 1, 112:18-113:1-2; see also, Exhibit 1 to Deposition, email between Roya Gholami and Dennis Papini dated 2-7-2019).

30.      GHOLAMI did not communicate with Dr. Hadidi between 2018 and the time she made efforts to return in 2019.  (Ex. 1, 119:3-7).

31.      GHOLAMI participated in an exit interview around March or April of 2018.  (Ex. 1, 49:11-16).

32.      GHOLAMI claims that she wanted to relay to Provost Papini her claims of sexual harassment by her department head, Dr. Hadidi, and the culture in general.  (Ex. 1, 50:2-8).

33.      Prior to reaching out to Provost Papini about potentially returning to the UIS, GHOLAMI had no conversations with Dean Bhattacharya.  (Ex. 1, 120:5-18).

34.      GHOLAMI agrees that Dean Bhattacharya was the main person she was talking to about potentially returning to the UIS and the terms for a potential return.  (Ex. 1, 121:2-122:4).

35.      GHOLAMI applied for a few positions in addition to UIS but did not receive offers from research institutions due to her limited profile.  (Ex. 1, 122:5-15).

36.      GHOLAMI admits that she did not interview with any institution other than UIS.  (Ex. 1, 124:5-7).

37.      GHOLAMI claims to have applied at five other institutions but was not offered a position or even an interview at any of them.  (Ex. 1, 123:19-124:7).

38.      At the time GHOLAMI communicated with Provost Papini about coming back to UIS, she had already told NEOMA, the University in France, that she was leaving.  (Ex. 1, 124:8-11).

3:22-cv-03268-CRL-EIL    # 22    Filed: 03/28/25    Page 6 of 30

39.    GHOLAMI knew at the time of her discussion with Provost Papini in 2019 that she did not have a job for the fall of 2019.  (Ex. 1, 124:8-15).

40.    GHOLAMI needed a job.  (Ex. 1, 124:12-18).

41.    GHOLAMI claims that she reached out to Provost Papini around March of 2019 asking if it was possible for her to come back to UIS.  (Ex. 1, 124:19-125:12).

42.    GHOLAMI admits that Provost Papini indicated he would discuss her inquiry with the dean and the college and that they would follow the procedures to hire or rehire someone. (Ex. 1, 125:13-21, 126:12-18, 127:12-128:8).

43.    A vote occurred of the business college which resulted in a favorable vote allowing GHOLAMI to return to the UIS.  (Ex. 1, 130:1-131:7).

44.    GHOLAMI asserts that a coworker, Mr. Wang, contacted her at some point. GHOLAMI claims that he was angry in his messages and calls with her.  (Ex. 1, 131:10-132:24).

45.    GHOLAMI admits that Mr. Wang was a colleague and coworker.  (Ex. 1, 132:7-9).

46.    GHOLAMI admits that she communicated with Mr. Wang after she left UIS and complained about other people at UIS to him before coming back in 2019.  (Ex. 1, 132:16-133:2).

47.    GHOLAMI admits that Mr. Wang was aware that she was not happy with certain aspects of the business college at UIS.  (Ex. 1, 133:3-6).

48.    GHOLAMI admits that Mr. Wang indicated that his anger was related to her failure to inform him that she was returning to UIS.  (Ex. 1, 134:6-21).

49.    GHOLAMI communicated with Mr. Wang using WhatsApp.  (Ex. 1, 141:1-142:24).

50.    In order to communicate with WhatsApp, one party would need to send their request to the other person to join.  (Ex. 1, 141:21-24).

Law No. 22-cv-03268
5442-468 TMP/DAD

51.    GHOLAMI does not recall who sent the request to the other person.  (Ex. 1,  142:1-143:24).

52.    GHOLAMI admits that prior to April of 2019, she told her former coworker, Mr. Wang, that she decided to take UIS to court for sexual harassment and discrimination.  (Ex. 1, 146:1-5).

53.    At the time of communicating with Mr. Wang regarding her intentions, GHOLAMI had not filed any IDHR complaints.  (Ex. 1, 146:17-21, 147:1).

54.    GHOLAMI agrees that anything she was referencing with respect to sexual harassment and discrimination which formed the basis of her decision to take UIS to court related to events that occurred prior to April of 2019.  (Ex. 1, 147:2-12).

55.    All of GHOLAMI's conversations with Mr. Wang (Tewei Wang) related to events that occurred while she had worked at UIS between 2015 and 2018.  (Ex. 1, 147:1-148:10).

56.    GHOLAMI agrees that her lawsuit at issue relates to her employment beginning in 2019.  (Ex. 1, 148:15-18).

57.    GHOLAMI agrees and admits that she did not file a lawsuit with respect to the issues that occurred prior to 2019.  (Ex. 1, 148:15-24).

58.    GHOLAMI agrees that her conversations with Mr. Wang occurred during a time that she was not working at UIS.  (Ex. 1, 159:6-9).

59.    GHOLAMI agrees that her discussions with Mr. Wang in April of 2019 included her reaction and discussions suggesting she was extremely disappointed and sad about her experience at UIS.  (Ex. 1, 168:12-17).

Law No. 22-cv-03268
5442-468 TMP/DAD

60.     At the same time that GHOLAMI is complaining about how she is very disappointed, sad and unhappy with her experiences at UIS, she is negotiating and trying to come back to UIS.  (Ex. 1, 168:18-23).

61.     GHOLAMI claims that she made efforts to come back to UIS hoping that there would be change with new leadership.  (Ex. 1, 169:1-19).

62.     Despite GHOLAMI's understanding and feelings of ongoing issues at UIS, she continued to negotiate with them to return.  (Ex. 1, 170:1-8).

63.     GHOLAMI admits that she received an offer of employment from Dean Bhattacharya on May 3, 2019.  (Ex. 1, 171:17-20).

64.     GHOLAMI believes her conversations with Mr. Wang (and Yazan Alnsur) occurred before the meeting to vote to allow her to return.  (Ex. 1, 173:1-5).

65.     GHOLAMI also believes these conversations occurred prior to receiving UIS Produced 40, an email offer from Dean Bhattacharya to her for employment.  (Ex. 1, 173:6-12; UIS Produced 40).

66.     GHOLAMI admits that the information contained in UIS Produced 40 sets out her offer of employment which includes a position as associate professor at UIS.  (Ex. 1, 173:17-21; UIS Produced 40).

67.     On April 9, 2019, Dean Bhattacharya offered GHOLAMI a position as an associate professor at UIS.  (Ex. 1, 17-21; UIS Produced 40).

68.     GHOLAMI agrees that she received this offer as stated.  (Ex. 1, 173:17-21; UIS Produced 40).

Law No. 22-cv-03268
5442-468 TMP/DAD

69.    GHOLAMI agrees that the position she was offered was the same position that she had left in 2018.  (Ex. 1, 173:22-24).

70.    GHOLAMI agrees that she was offered a salary of $117,133.00.  (Ex. 1, 174:1-3; UIS Produced 40).

71.    GHOLAMI admits that she accepted this offer.  (Ex. 1, 174:9-11; UIS Produced 40).

72.    GHOLAMI admits that her acceptance of the offer does not include any conditions to the offer.  (Ex. 1, 174:12-175-1).

73.    GHOLAMI admits that after the negotiations, the offer noted in UIS Produced 40 is the one that was final and made to her.  (Ex. 1, 175:1-9; UIS Produced 40).

74.    GHOLAMI accepted this offer as stated in UIS Produced 40.  (Ex. 1, 175:1-13; UIS Produced 40).

75.    After GHOLAMI accepted the offer, she received a formal letter which she signed. (Ex. 1, 175:14-21).

76.    GHOLAMI's signature is noted at UIS Produced 53 of the formal letter at UIS Produced 52-53.  (Ex. 1, 175:14-19; UIS Produced 52-53).

77.    GHOLAMI admits that she signed the formal letter on May 12, 2019.  (Ex. 1, 175:20-23; UIS Produced 52-53).

78.    GHOLAMI then received a formal Notification of Appointment.  (Ex. 1, 176:9-13; UIS Produced 54-55).

79.    GHOLAMI agrees that she did not notify her unit that she did not wish to accept the appointment identified in UIS Produced 54-55 within 30 days.  (Ex. 1, 176:9-177:16; UIS Produced 54-55).

Law No. 22-cv-03268
5442-468 TMP/DAD

80.    GHOLAMI agrees that she made no indication that she did not want to work at UIS under the terms identified in her offers and letters of appointment.  (Ex. 1, 178:2-8).

81.    GHOLAMI began working in August of 2019 under the terms that were outlined in the offer.  (Ex. 1, 178:9-15; UIS Produced 52-55).

82.    GHOLAMI admits that she filed her IDHR charges in October of 2019.   (Ex. 1, 178:16-18).

83.    GHOLAMI admits that UIS Produced 1-4 are the IDHR charges she filed.  (Ex. 1, 178:19-22; UIS Produced 1-4).

84.     GHOLAMI admits that her IDHR complaint in October of 2019 refers to her complaint about her status as an associate professor.  (Ex. 1, 179:17-20; UIS Produced 1-4).

85.    GHOLAMI wanted to be a full professor.  (Ex. 1, 179:24-180:1, 180:7-12).

86.    GHOLAMI, however, accepted her position with the status as associate professor. (Ex. 1, 180:18-20).

87.    GHOLAMI accepted the money that was offered to her as an associate.  (Ex. 1, 180:21-22, 181:2).

88.    GHOLAMI admits that she took the job in order to keep her green card.  (Ex. 1, 181:13-182:2).

89.    GHOLAMI admits that in order to keep her green card, she could have taken any employment at any position in the United States.  (Ex. 1, 182:1-18).

90.    GHOLAMI agrees that this would have included taking a position to work in the cafeteria.  (Ex. 1, 182:13-15).

91.    UIS had no legal obligation to offer GHOLAMI a position in 2019.  (Ex. 1, 186:5-19).

Law No. 22-cv-03268
5442-468 TMP/DAD

92.    GHOLAMI admits that she did not fill out an application to begin the process of being promoted to full professor.  (Ex. 1, 187:3-190:7).

93.    Since GHOLAMI's return to UIS in 2019, she has not filed an application to become a full professor to date.  (Ex. 1, 190:8-10).

94.    GHOLAMI understands that as long as she does not apply she is not going to be elevated to full professor.  (Ex. 1, 190:19-21, 191:1).

95.    GHOLAMI believes that her terms of her employment offer were impacted by her Iranian national origin is based upon a conversation she had with Mr. Wang after she returned. (Ex. 1, 201:20-202:2).

96.    This conversation with Mr. Wang occurred after GHOLAMI had already accepted the offer of employment.  (Ex. 1, 202:11-15).

97.    GHOLAMI agreed that Mr. Wang suggested that she was treated more favorably because of her national origin and because of her sex and gender.  (Ex. 1, 203:1-204:21).

98.    GHOLAMI identifies Ranjan Karri as a person she feels as a comparative employee. (Ex. 1, 207:20-208:5).

99.    GHOLAMI agrees that Mr. Karri was promoted to full professor in 2019 after 13 years at UIS and after having completed an application to become full professor.  (Ex. 1, 208:6-15).

100.    GHOLAMI agrees that after completing the process, Mr. Karri was promoted.  (Ex. 1, 208:16-19).

101.    GHOLAMI also suggests that Mr. Wang is a comparator.  (Ex. 1, 209:12-24).

102.    Mr. Wang is a full professor now.  (Ex. 1, 210:1-3).

Law No. 22-cv-03268
5442-468 TMP/DAD

103.    GHOLAMI agrees that Mr. Wang meets the qualifications based on UIS faculty requirements. (Ex. 1, 210:10-14).

104.    GHOLAMI also agrees that these individuals completed the application and that they each may have been rejected first before becoming full professors. (Ex. 1, 210:15-21).

105.    GHOLAMI agrees that a majority of the people who may apply for full professorship may be declined the first time. (Ex. 1, 210:22-211:2).

106.    GHOLAMI believes that both Mr. Wang and Dr. Li, her alleged comparators, were both denied full professorship the first time they applied. (Ex. 1, 211:6-9).

107.    GHOLAMI has no evidence to support her claim that her gender played a role in the terms of the offer made to her by Dean Bhattacharya in April of 2019. (Ex. 1, 214:21-216:22).

108.    Dean Bhattacharya did not work at UIS until 2019. (Ex. 1, 219:15-22).

109.    GHOLAMI claims that the offer made to her was discriminatory is based upon a vague allegation of discrimination and her own life experiences. (Ex. 1, 217:1-8).

110.    GHOLAMI agrees that her status a full professor is not related to her annual performance review since she returned in 2019. (Ex. 1, 219:8-12).

111.    When GHOLAMI returned in 2019, she came back with full tenure. (Ex. 1, 228:17-20).

112.    GHOLAMI has no information to suggest that any other full professors at UIS in the business college who made full professor did not fill out an application. (Ex. 1, 235:1-6).

113.    GHOLAMI agrees that she quit her job to move to France in 2018. (Ex. 1, 236:8-114).

Law No. 22-cv-03268
5442-468 TMP/DAD

114.    GHOLAMI has been provided a contract every year since her hiring in 2019.  (Ex. 1, 250:16-251:22).

115.    Each one indicates that GHOLAMI may give notice within 30 days of the appointment if she chooses not to accept it which she ignores.  (Ex. 1, 251:17-22).

116.    At no time has GHOLAMI given notice that she does not wish to accept her appointment to continue her contract since 2019.  (Ex. 1, 251:23-252:3, 252:7-9).

117.    GHOLAMI admits that she came to the conclusion that she should not have resigned and left in 2018 which prompted her to file her IDHR claim in October of 2019.  (Ex. 1, 252:21-254:11).

118.    GHOLAMI admits that she filed this lawsuit based upon events that occurred prior to August of 2019.  (Ex. 1, 254:14-17).

119.    Professor Wang is a full professor but not in a managerial position.  (Ex. 1, 260:24-261:2).

120.    GHOLAMI admits that she attempted to use her claims of sexual harassment as the basis and context for resigning in the first place as some sort of negotiation leverage when negotiating with Dean Bhattacharya.  (Ex. 1, 182:23-183:7).

121.    GHOLAMI admits that she had to return to the United States and no other option.  (Ex. 1, 183:8-10).

122.    GHOLAMI believed it was important for Dean Bhattacharya to know the context of her resignation and inserted this information into the negotiation process in an effort to improve her negotiation abilities.  (Ex. 1, 183:2-184:21).

123.    In fact, GHOLAMI wanted UIS to consider her reasons for resignation as a factor in her negotiations.  (Ex. 1, 184:15-21).

124.    GHOLAMI admits that Dean Bhattacharya did not change the terms of the offer that had been made to her after she reported this information.  (Ex. 1, 184:22-185:2).

125.    GHOLAMI had no contract with the school requiring her to be rehired in 2019.  (Ex. 1, 186:16-19).

126.    GHOLAMI's counsel stipulates that there was no legal obligation for the school to rehire her.  (Ex. 1, 186:16-187:2).

127.    GHOLAMI did not fill out an application because she assumed it would be unsuccessful.  (Ex. 1, 194:1-24).

128.    GHOLAMI accepted the offer outlined by Dean Bhattacharya on April 9, 2019, as set forth in UIS Produced 40.  (UIS Produced 40).

**B.    Statements from Deposition of Dennis Papini taken 11-14-2024**

129.    Dennis Papini was the Provost and Vice Chancellor from Academic Affairs from the fall of 2017 through January of 2023.  (Ex. 2, 8:2-9:16).

130.    When Provost Papini came to the UIS, he had no personal relationship with GHOLAMI.  (Ex. 2, 13:25-14:4).

131.    Provost Papini conducted an exit interview with GHOLAMI.  (Ex. 2, 15:4-6).

132.    No one else was present for that interview.  (Ex. 2, 15:7-9).

133.    At the time of the exit interview, Provost Papini was not aware of any complaints or criticisms of GHOLAMI from her college.  (Ex. 2, 16:1-4).

Law No. 22-cv-03268
5442-468 TMP/DAD

134.    Provost Papini admits that GHOLAMI reported to him that she was uncomfortable around Dr. Hadidi, the head of the MIS department, who had asked her to lunch once and she declined, which made her uncomfortable.  (Ex. 2, 16:5-17:2).

135.    Provost Papini did not discuss GHOLAMI's complaint about Dr. Hadidi with Dean Bhattacharya when he came to the university.  (Ex. 2, 19:1-18).

136.    According to Provost Papini, the issues of Dr. Hadidi's leadership in the MIS department resolved itself when he retired from the university.  (Ex. 2, 23:8-17).

137.    Provost Papini verbally indicated to GHOLAMI that if she were willing to return should Dr. Hadidi depart that the university would welcome her.  (Ex. 2, 25:5-15).

138.    Provost Papini does not recall expressing to Dean Bhattacharya the specific reasons as to why GHOLAMI had left UIS originally.  (Ex. 2, 27:7-9).

139.    Provost Papini admits that the rehiring process for GHOLAMI was different for  her. The usual search process was not followed.  He believes a search waiver was obtained.  (Ex. 2, 26:17-27:9).

140.    Dean Bhattacharya was responsible for negotiating the contract with GHOLAMI. (Ex. 2, 28:25-29:5).

141.    These terms would be subject to approval by the Provost.  (Ex. 2, 29:6-7).

142.    When GHOLAMI was rehired, she was rehired as an associate professor.  (Ex. 2, 30:1-24).

143.    When GHOLAMI resigned, she had just recently been promoted to associate professor and awarded tenure.  (Ex. 2, 30:15-19).

Law No. 22-cv-03268
5442-468 TMP/DAD

144.     Provost Papini approved the contract that GHOLAMI signed regarding her rehire as an associate professor and her salary.  (Ex. 2, 31:23-32:2).

145.     GHOLAMI was given tenure upon her return to the university.  (Ex. 2, 32:8-11).

146.     Typically, when professors are hired, most, but not all, would have to work at the university for a certain period of time before being given tenure.  (Ex. 2, 32:12-17).

147.     Since GHOLAMI's return to the university, she has not followed the process to be promoted to full professor.  (Ex. 2, 32:22-33:1).

148.     Provost Papini has encouraged GHOLAMI to apply for full professorship.  (Ex. 2, 33:2-5).

149.     To Provost Papini's knowledge, no one has indicated to GHOLAMI that she cannot apply to be a full professor.  (Ex. 2, 33:15-18).

**C.     Statements from Deposition of Somnath Bhattacharya taken 11-12-2024**

150.     Somnath Bhattacharya is the dean of the College of Business and Management and Professor of Accounting.  (Ex. 3, 7:18-22).

151.     Dean Bhattacharya has been working at UIS since February of 2019.  (Ex. 3, 7:23-8:3).

152.     Dean Bhattacharya learned that GHOLAMI expressed some interest in returning to UIS.  (Ex. 3, 23:14-18).

153.     Dean Bhattacharya obtained this information from Provost Papini.  (Ex. 3, 23:19-24).

154.     Dean Bhattacharya understood that GHOLAMI had a change of heart with respect to her present employment in Europe and wanted to return to UIS.  (Ex. 3, 25:2-8).

Law No. 22-cv-03268
5442-468 TMP/DAD

155.    Dean Bhattacharya understood that Provost Papini supported GHOLAMI's return to the university.  (Ex. 3, 25:14-24).

156.    Dean Bhattacharya admits that GHOLAMI wrote to him in his capacity as the new dean expressing her desire to return to the MIS department and to UIS.  (Ex. 3, 26:1-9).

157.    Between the time that Dean Bhattacharya spoke to Provost Papini and the time that he communicated with GHOLAMI, he does not recall communicating with anyone else about GHOLAMI's potential return to the university.  (Ex. 3, 26:10-20).

158.    After GHOLAMI left the university, Dean Bhattacharya was not aware of any ongoing process to fill GHOLAMI's position prior to her reaching out to return.  (Ex. 3, 29:1-30:24).

159.    The authorized process for GHOLAMI returning to the university with no open posted position would require that the Provost grant the position to the department chair typically.  (Ex. 3, 31:1-32:8).

160.    First, the Provost would have to sign off on the position and then Dean Bhattacharya would have to ask the department to waive the search through a vote.  (Ex. 3, 32:9-22).

161.    This would require agreement by Provost Papini and the faculty members at the time.  (Ex. 3, 33:1-23).

162.    Dean Bhattacharya agrees that GHOLAMI returned with tenure but that the university was not required to have her return with tenure.  (Ex. 3, 49:11-24).

163.    The Provost suggested that we have her return with tenure and Dean Bhattacharya agreed.  This was affirmed by a vote through the department.  (Ex. 3, 50:1-6).

Law No. 22-cv-03268
5442-468 TMP/DAD

164. Dean Bhattacharya agrees that the offer made to GHOLAMI is set forth in UIS Produced 40, Exhibit 1 of his deposition. (Ex. 3, 50:23-51:3).

165. Dean Bhattacharya agrees that it was his decision with agreement by Provost Papini to bring GHOLAMI back as an associate professor. (Ex. 3, 51:24-52:5).

166. Dean Bhattacharya relied upon Article 6 of the policies and procedures produced as UIS Produced 29-32 in determining how someone could be considered for associate professor or full professor. (Ex. 3, 52:11-54:13; UIS Produced 29-32).

167. Dean Bhattacharya based his determination of GHOLAMI's status based upon his reading of the policy. (Ex. 3, 54:14-17).

168. Dean Bhattacharya is not aware of the specific process for professors who have quit and come back. (Ex. 3, 60:3-8).

169. There is no formal specific process for that category of individual. (Ex. 3, 60:9-12).

170. Within the College of Business, Dean Bhattacharya is not aware of any other professors who have quit and come back other than GHOLAMI. (Ex. 3, 60:9-16).

171. Individuals who arrive from different institutions are not able to dictate their title as far as rank when they come into the facility. (Ex. 3, 60:17-21).

172. GHOLAMI signed the offer letter and countersigned the agreement indicating her willingness to return along with the terms and conditions that were laid out to her. (Ex. 3, 61:1-8; UIS Produced 52-53).

173. The terms outlined in UIS Produced 52-53 were negotiated between Dean Bhattacharya and GHOLAMI with approval from Provost Papini. (Ex. 3, 61:17-20).

174.    Typically, faculty members join as an assistant professor if they have a PhD already completed.  (Ex. 3, 44:7-12).

175.    Dean Bhattacharya's understanding of the promotion terms for UIS includes that a tenured associate professor has a six-year minimum period before becoming eligible to apply for a promotion to full professor.  This is not a given but a minimum standard before promotion to full professor.  (Ex. 3, 44:10-45:8).

176.    Dean Bhattacharya indicated that he agreed that his understanding and bases for promotion was UIS Produced 29-32.  (UIS Produced 29-32).

177.    UIS Produced 29-32 are the relevant sections of the UIS personnel policy regarding promotion.  (UIS Produced 29-32).

178.    Candidates for promotion consideration have the burden of proof and documentation. Each candidate shall be responsible for the preparation of a portfolio for promotion that documents eligibility and satisfaction of the criteria for the rank sought as specified in this policy. (UIS Produced 29).

### III. LEGAL ARGUMENT

**A.    Legal Standard**

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. Proc. 56(c).  Plaintiff has the ultimate burden of proof under Title VII to demonstrate that there is a genuine issue of material fact that requires trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  Defendant acknowledges that the court must evaluate the admissible

evidence supporting the motion for summary judgment in a light most favorable to plaintiff as the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

**B.    There are no Facts to Support Plaintiff's Claim of National Origin or Gender Discrimination**

Plaintiff alleges that she was discriminated against because of her Iranian national origin and/or her gender.  In order to state a claim for discrimination and survive summary judgment, the plaintiff must present evidence that would permit a reasonable fact finder to conclude that the plaintiff's protected status caused an adverse employment action.  *Khungar v. Access Community Health Network*, 985 F.3d 565, 573 (7th Cir. 2021).  Counts I and II of Plaintiff's Complaint assert claims for national origin and gender discrimination.  The analysis of these counts is identical.  Title VII makes it unlawful for an employer "to fail or refuse to hire . . . any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a). At summary judgment, the critical question is whether the plaintiff has produced enough evidence to permit a reasonable fact finder to conclude that the plaintiff's race or other proscribed factor caused the adverse employment action.  *Chatman v. Bd. of Ed. of the City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021) citing *Purtue v. Wisconsin Dept. of Corrections*, 963 F.3d 598, 602 (7th Cir. 2020). In order to answer this question, the court looks at the evidence holistically.  *Id.* citing *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).  All of the evidence belongs in a single pile and must be evaluated as a whole.  *Id.*

The court may use the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 Sup. Ct. 1819 (1973), as a way to assist the court in sifting through the evidence to assess whether discrimination under Title VII is established.  *Id.* at 746; *Chatman*, 5 F.4 at 746.

Law No. 22-cv-03268
5442-468 TMP/DAD

Applying the *McDonnell Douglas* framework to this Title VII claim of national origin and sex discrimination, the plaintiff must first produce evidence establishing a 4-part prima facie case: "(1) she was a member of a protected class; (2) she applied for and was qualified for the position sought; (3) she was rejected for the position; and (4) the employer hired someone outside the protected group who was not better qualified than the plaintiff." *Chatman* at 746 citing *Johnson v. Gen. Bd. of Pension and Health Benefits of United Methodist Church*, 733 F.3d 722, 728-29 (7th Cir. 2013). If plaintiff is able to establish a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Johnson* at 728. If the employer supplies a legitimate non-discriminatory reason, the burden then shifts back to the plaintiff to produce evidence that the defendant's reason is pretext for discrimination. *Johnson*, 733 F.3d at 728. In this context, pretext "means a lie, specifically a phony reason for some action." *Chatman* at 746 citing *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). We have also referred to pretext as to an employer's efforts to cover their tracks or hide their real reason for not hiring an applicant. *Chatman* at 746-47 citing *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1175 (7th Cir. 2002). In addition to establishing pretext, the plaintiff also must establish that the explanations provided by the defendants are pretext for the prohibited animus. *Chatman* at 747 citing *Hitchcock v. Angel Corps., Inc.*, 718 F.3d 733, 740 (7th Cir. 2013).

### 1.    Defendant Does Not Dispute That GHOLAMI was a Member of a Protected Class

Defendant does not dispute that Plaintiff is Iranian. Plaintiff may assert that Iran is her country of national origin. Defendant does not dispute that Plaintiff identifies as a female. Defendant agrees that Plaintiff may assert that her gender is a protected class. Defendant denies that any decisions made were related to Plaintiff's gender or national origin.

Law No. 22-cv-03268
5442-468 TMP/DAD

### 2.    Plaintiff Did Not Apply for the Position Sought - Full Professor

Plaintiff has the burden of establishing that she applied for and was qualified for the position she sought to meet her initial burden of a prima facie claim. *Chatman* at 746. Defendant understands Plaintiff's claims of discrimination to derive from her claim that she should have been hired as a full professor. Accordingly, Plaintiff must prove that she both applied for and was qualified for the position of full professor at UIS. *Id*. Defendant denies that Plaintiff has ever applied for the position of full professor. There are no facts to support this necessary element of her claim.

Plaintiff's interactions with Defendant, and its employees, relevant to the discrimination claim, begin with her desire to return to the United States to maintain her immigration status. (UMF 6). She decided to leave her employment in France after her first semester teaching there which began the fall of 2018. (UMF 25). This decision included a return to the United States (UMF 26) which required obtaining a job in the U.S. (UMF 40). As part of her job search, Plaintiff reached out to Provost Papini around March of 2019 asking about the possibility of returning to UIS. (UMF 41). Defendant through Provost Papini advised that he would and did take steps to determine the possibility of rehiring. Defendant had no legal obligation to rehire Plaintiff. (UMF 91, 92, 125-126). These steps included following a special hiring process for Plaintiff. (UMF 139). When Plaintiff reached out, Defendant was not engaged in an ongoing process to fill an open posted position in the MIS department. (UMF 158). The process for GHOLAMI involved the Provost, the Dean and faculty agreeing to allow Plaintiff to return. (UMF 160-161). Dean Bhattacharya with approval from Provost Papini and the faculty offered Plaintiff a position as an associate professor in the MIS department. (UMF 165). The terms of the final offer were initially conveyed to Plaintiff on April 9,

Law No. 22-cv-03268
5442-468 TMP/DAD

2019. (UIS Produced 40). She accepted these terms. (UIS Produced 40). A formal letter was sent to Plaintiff dated May 3, 2019 offering the opportunity to join the faculty of UIS as an associate professor in the Management Information Systems (MIS) beginning August of 2019 at a salary of $117,133.00. (UIS Produced 52-53). Plaintiff again accepted the terms and signed off on the documents on May 12, 2019. (UIS Produced 53, UMF 172-173, UMF 86-87).

To the extent Plaintiff was desirous of a promotion, she has and had the burden of completing the steps outlined by the promotion policy to be considered for advancement to full professor. (UMF 178). Since her return to UIS in August of 2019, Plaintiff has not filled out the necessary application, as defined by the promotion policy (UMF 29-32) to begin the process of being promoted to full professor. (UMF 92-93). She understands that as along as she does not apply and follow the stated process, she will not be elevated to full professor. (UMF 94).

Wherefore, Plaintiff has not met this element of her claim.

**3.    GHOLAMI Was Not Rejected for the Position**

As Plaintiff has never applied for the position of full professor, she was never rejected for that position. Defendant had no obligation to offer any position to Plaintiff. (UMF 91). Logically, it had no duty to offer a specific position to her if one was offered. Similarly, Plaintiff had no obligation to accept the offer that was made to her at the rank of associate professor. However, she did accept the offer. (UMF 86-87). She then filed her IDHR complaint in October 2019 complaining about her status and salary. (UMF 82, 83; see also UIS Produced 1-4).

It should not go unnoted that Plaintiff's inquiry was met with a favorable employment action, not an adverse one. Plaintiff has the burden of establishing that an adverse employment decision occurred. The evidence supports an opposite finding. Plaintiff reached out to see if she

Law No. 22-cv-03268
5442-468 TMP/DAD

could return to UIS. (UMF 41).  In response, a position was offered to her which she accepted. (UMF 71).  Plaintiff indicates that she regrets resigning in 2018. (UMF 117). Her personal feelings about her own decisions prompted her to file her IDHR complaint in 2019. (UMF 117).  Plaintiff's remorse for leaving and for not filing a harassment charge is not evidence of her current claim. Moreover, although Plaintiff acknowledges that her complaint refers to the actions associated with her rehire in 2019 (UMF 56), she admits that the evidence she relies upon occurred during her initial employment period (UMF 118) and that she failed to file claims relating to her prior employment period. (UMF 57). Claims relating to her initial employment were not alleged here and are not actionable despite her statement to the contrary.

Plaintiff admits that she has no evidence to support her claim that her gender played a role in establishing the terms of the offer made by Dean Bhattacharya. (UMF 107).  She also admits that her claim of discrimination is based upon her vague allegation and her personal life experience. (UMF 109).  Plaintiff did suggest that her evidence of national origin discrimination stems from conversations she had with a former co-worker, Professor Wang. (UMF 95-96). However, this conversation occurred after she had already accepted the employment offer by Dean Bhattacharya (UMF 96) wherein Mr. Wang expressed his belief that she was treated more favorably because of her gender and national origin. (UMF 97).   Furthermore, Mr. Wang's testimony does not support her claim. Accordingly, there is no admissible evidence to support Plaintiff's claim that she was treated worse than anyone else as relates to her rehire. The evidence establishes that Plaintiff was granted a streamlined employment opportunity that resulted in her achieving employment in the United States which was her stated goal.

Law No. 22-cv-03268
5442-468 TMP/DAD

**4.    Defendant Did Not Hire a Less Qualified Person Outside of the Protected Group**

Plaintiff also has the burden of establishing that a less qualified person outside of the protected group was hired for the position at issue. As noted herein, the position at issue is a full professor position within the MIS department at UIS. This position was never offered to Plaintiff, nor to anyone else at the time of her negotiation process. Accordingly, Plaintiff cannot prove this element and her claim must fail. Plaintiff was offered the position of associate professor in response to her inquiry of a possible return. No one else was considered for the position offered. The position offered was not the position sought. Plaintiff mentioned others such as Professor Karri and Professor Wang as comparators. (UMF 98, 101). However, she admits that they followed the promotion procedures outlined by the University's Faculty Handbook. (UMF 99, 103, 104). She also admits that Mr. Wang meets the qualifications required. (UMF 103). She also acknowledges that Mr. Wang and Dr. Li failed in their initial attempts to become full professor which is common. (UMF 104, 105, 106). There is no evidence to suggest that anyone who was promoted with a different gender or national origin was less qualified. Plaintiff has chosen NOT to make any effort to seek promotion per the established policies and procedures outlined in the Faculty Handbook. (UMF 176-77; UIS Produced 29-32).

Plaintiff has the burden of establishing that similarly-situated individuals not in Plaintiff's protected class were treated more favorably. Determining whether employees are similarly situated is a "flexible, common sense, and factual" inquiry. *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). Relevant factors include whether the employees held the same job description, were subject to the same standards, were subject to the same supervisor, and had comparable experience, education, and other qualifications. *David v. Board of Trustees of Community College*

Law No. 22-cv-03268
5442-468 TMP/DAD

*Dist. No. 508*, 846 F.3d 216, 225-26. (7th Cir. 2017). No one else qualifies as a comparator to Plaintiff. Plaintiff has no evidence to suggest that another person had quit and attempted to come back at a higher rank and salary without following the promotion process outlined in the Faculty Handbook. There are no such people.

Accordingly, Plaintiff has not proven this necessary element of her claim.

### 5.     Defendant Offered Plaintiff the Position of Associate Professor in Response to Her Inquiry

As Plaintiff has failed to meet these necessary elements of her claim, there is no burden shifting to the Defendant. Nevertheless, the evidence establishes that Plaintiff was offered a position after reaching out to Provost Papini about a possible return. Defendant offered her the position of associate professor. She accepted the position at the terms offered. (UMF 128). Plaintiff could have gone elsewhere. Plaintiff did not have to accept the offer. She could have rejected the offer or rejected the terms as stated in her contracts. (UMF 114, 115). She has not rejected the terms. (UMF 116). Plaintiff could have followed the promotion policy. She chose not to do so. (UMF 127).

### C.     The Evidence Does Not Support a Claim of Retaliation

In order to succeed on her retaliation claim, Plaintiff must produce evidence that would allow a reasonable jury to conclude that: (1) she engaged in a statutorily protected activity; (2) the Defendant took a materially adverse action against her, and (3) there was a causal connection between GHOLAMI's protected activity and the Defendant's action. *Mollet v. City of Greenfield*, 926 F.3d 894,896 (7th Cir. 2019). Causation for a Title VII retaliation claim requires a plaintiff to show "but for" causation. *Chatman* at 748-49 citing *Univ. of Texas SW Med. Ctr. v. Nassar*, 570 U.S.

Law No. 22-cv-03268
5442-468 TMP/DAD

338, 360 (2013).  The plaintiff must show that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.  *Id*.

It is undisputed that Plaintiff made a report to Provost Papini during her exit interview suggesting that she was uncomfortable around Dr. Hadidi. (UMF 134).  Provost Papini asked her if she wanted to file a formal complaint. She chose not to do so. (Ex. 1, p. 74 and 75). Defendant concedes that such report would be protected speech under the law.

Defendant denies that a materially adverse action was taken. Defendant owed no duty to Plaintiff to hire her back.  As discussed above, Plaintiff reached out to inquire about the possibility of coming back to UIS. The actions taken in response lead to an offer of employment. This can only be seen as a favorable action as Defendant had the right to say there was no opportunity for her. Instead, Defendant engaged in steps to allow an exception to the standard hiring procedures which included a return to the same position, same salary and tenure.  (UIS Produced 52-53).

Even assuming, for purposes of argument, that the offer of employment made could be seen as negative, Plaintiff has no evidence to suggest that the terms of her offer would have been better or different had she not complained. In fact, the evidence suggests that Provost Papini recommended rehire to Dean Bhattacharya because of her complaints, not despite them. (UMF 137). There is no evidence to causally connect the offer terms by Dean Bhattacharya to an informal complaint made to Provost Papini (at a time when Dean Bhattacharya was not even working at UIS).  Although Defendant agrees that Plaintiff made an informal complaint to Provost Papini during her exit interview, Provost Papini does not recall discussing GHOLAMI's complaints with Dean Bhattacharya. (UMF 138).  Dean Bhattacharya negotiated the contract terms with Plaintiff. (UMF 140).  Dean Bhattacharya states that he understood that Plaintiff would be eligible for

Law No. 22-cv-03268
5442-468 TMP/DAD

promotion in 2023 according to his interpretation of the UIS promotion policies. (UIS Produced

40).  The accuracy of his interpretation is irrelevant.  Dean Bhattacharya refers to the promotion

section of the Faculty Personnel Policy as the basis of his understanding of promotion eligibility

at the time the offer was made. In addition, Plaintiff admits that she told Dean Bhattacharya about

her complaints concerning Dr. Hadidi after the initial offer terms were made. (UMF 120).  She felt

that it was important for him to be aware of the context of her resignation to try and improve her

negotiation status. (UMF 122). Plaintiff admits that she was attempting to use protected speech

as a means of manipulating Dean Bhattacharya into giving her better terms. (UMF 122-123).  She

was not successful. Dean Bhattacharya did not change the terms of his offer after she advised him

of her complaints of sexual harassment. (UMF 124).  Dean Bhattacharya's failure to cave to

Plaintiff's efforts of manipulation are not evidence of retaliation.  The offer was made prior to the

discussion of her prior circumstances per her own account. There is no evidence to suggest that

Plaintiff's rehire terms would have been improved absent her protected speech.

D.    **Plaintiff has Failed to Mitigate her Damages by Refusing to Apply for Promotion**

Defendant has asserted the affirmative defense of failure to mitigate.  If Plaintiff is able to

successfully establish her claims of discrimination or retaliation, including damages, Defendant

acknowledges that it has the burden of establishing that Plaintiff has failed to mitigate damages

or that her damages were less than she asserts.  *Hutchison v. Amateur Electronic Supply, Inc.*,

42 F.3d 1037 (7th Cir. 1994), citing *Gaddy v. Abex Corp.*, 884 F.2d 312,318 (7th Cir. 1989). Defendant

must show that: (1) Plaintiff failed to exercise reasonable diligence to mitigate her damages, and

(2) there was a reasonable likelihood of success by exercising reasonable diligence. *Id*. It is

undisputed that the Plaintiff's claims stem from her rehiring in 2019. Her start date was August of

Law No. 22-cv-03268
5442-468 TMP/DAD

2019 (UIS Produced 50-53). Since that date, Plaintiff has failed to follow the procedures outlined in the Faculty Handbook for promotions, despite admitting her awareness that a failure to do so will keep her at her current rank. (UMF 92-94). Defendant acknowledges that the rank of full professor typically correlates with an increase in salary as compared to an associate professor. As Plaintiff has failed to initiate the process to obtain a promotion, Defendant asserts that Plaintiff has failed to mitigate her damages relating to any claim for lost wages she may have. Plaintiff acknowledges that failure on the first attempt to become a full professor is common. (UMF 104-106). Plaintiff's purposeful failure to assist herself by initiating the process delays her ability to become a full professor knowing that others have been declined initially but were successful on a later attempt. (UMF 100-104). Plaintiff was encouraged by Provost Papini to apply for this rank upon her return. (UMF 148-149).

It is undisputed that Plaintiff has the ability to perform her job duties. Evidence that others who have applied for rank promotions were successful after multiple attempts is some evidence that following the process is likely to result in success and definitely more likely than doing nothing. The procedures in the handbook place the burden on the applicant to establish qualifications and eligibility for the desired rank. (UMF 29-32). Effort is required. The chances of promotion without effort on Plaintiff's part is zero. Accordingly, this lack of effort guarantees a status quo in terms of rank. Effort on Plaintiff's part is guaranteed to provide her with success in terms of identifying any barriers to promotion to allow for remediation.

## IV.  CONCLUSION

Plaintiff was hired by the Defendant when no position was posted for hire. She took the job and then filed a lawsuit within a few months complaining about the terms that she had agreed

Law No. 22-cv-03268
5442-468 TMP/DAD

to in writing. Plaintiff has no evidence to support her claims that the decisions made regarding

her employment were adverse. Defendant asserts that all actions taken were favorable to Plaintiff

as she had no legal right to any position; however, one was opened and offered to her.  As Plaintiff

has no facts to support the necessary elements of each of her claims for discrimination and

retaliation, Defendant is entitled to summary judgment.

WHEREFORE, Defendant prays that this Court would grant this motion for summary

judgment and enter judgment in favor of Defendant and against Plaintiff plus costs of suit.

Respectfully Submitted,

BOARD OF TRUSTEES OF THE UNIVERSITY
OF ILLINOIS, Defendant

s/ Theresa M. Powell
Theresa M. Powell, IL ARDC #: 6230402
HEYL, ROYSTER, VOELKER & ALLEN, P.C.
4205 Wabash Avenue
Springfield, IL 62711
Direct Dial: 217.391.0921
Facsimile: 309.420.0402
Email: tmpowell@heylroyster.com

## PROOF OF SERVICE

I hereby certify that on March 28, 2025, I electronically filed the foregoing instrument with the
Clerk of the Court using the CM/ECF system which will send notification of such filing to the
following:

John A. Baker
BAKER, BAKER & KRAJEWSKI LLC
415 South Seventh Street
Springfield, IL 62701
Email: jab@bbklegal.com
**Counsel for Plaintiff**

s/ Theresa M. Powell
Theresa M. Powell

TMP/cs (5442-468)
45519427.1