E-FILED
Tuesday, 27 May, 2025  10:44:47 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| ROGHIEH GHOLAMI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 22-cv-03268-CRL-EIL |
| | ) | |
| BOARD OF TRUSTEES OF THE | ) | |
| UNIVERSITY OF ILLINOIS, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Dr. Roghieh Gholami is a highly respected professor at University of Illinois-Springfield. She teaches in its MIS program and has historically been the most cited professor throughout its College of Business Administration.

Gholami initially worked at UIS as from 2015-2018. During that period of time she was granted tenure as an associate professor. By all accounts, she was an exceptional professor. Unfortunately for her, the Chair of her department, Dr. Rassule Haididi subjected her to sexual harassment. She made complaints about the harassment, and nothing was done about to address her concerns. Ultimately, she decided to seek employment elsewhere.

In 2018 Gholami accepted a position at a university in France. UIS' Provost, Dennis Papini, its chief academic officer, was troubled that Gholami left and

1

wanted to meet with her to discuss why she was leaving. During that meeting she told him that she had been subjected to sexual harassment by Haididi and couldn't stay. Papini asked her if she would consider returning if Dr. Haididi was gone and Ghoalmi said she would.

In early 2019 Papini reached out to Gholami to let her know that Haididi would be leaving. He suggested to her that because of her abilities, they wanted her back at UIS. The timing was good because Gholami was looking to return to the United States and she pursued a return. Gholami pursued the return and, given she was a tenured full professor at a comparable institution in the United Kingdom, she sought to be returned at that same level. She was not offered that position. Despite her clear qualifications, she was offered the position of associate professor. This was a downgrade both financially and professionally.

UIS had no basis to not offer her the full professor position. She was clearly exceptionally well qualified. She was the most cited member of her College and well respected by all. The decision was falsely attributed to UIS policies. Given that this was not true, a jury could find in Gholami's favor.

Before turning to the substance of her arguments, it is important to understand what Gholami's complaint is about. She is not claiming sexual harassment or anything else related to her initial tenure at UIS. Her claims are all related to the decision to return her as an associate professor and not a full professor when she came back in 2019.

Gholami's complaint is broken into three separate claims, two under the substantive provisions of Title VII and one under the retaliation provision. Count I alleges that she was discriminated against by not returning her as a full professor because of her national origin in violation of 42 U.S.C. § 2000e-2. Count II alleges that she was discriminated against by not returning her as a full professor because of her gender in violation of 42 U.S.C. § 2000e-2. Count III alleges that she was discriminated against by not returning her as a full professor in retaliation for her earlier complaints of discrimination in violation of 42 U.S.C. § 2000e-3.

At question here are the motivations guiding her return. UIS contends that she was not eligible to become a full professor under its policies. This statement is wrong. Given the disputed facts, summary judgment is not proper, and this matter should be set for trial.

## STATEMENT OF FACTS[1]

### A. Undisputed Material Facts

1. The Plaintiff, Roghieh "Roya" Gholami (hereinafter "GHOLAMI"), is currently employed at University of Illinois-Springfield (hereinafter "UIS" or "university"). (Ex. 1, 5:20-22).

2. GHOLAMI has been working at UIS since August of 2019. (Ex. 1, 5:23-6:4).

3. Prior to 2019, GHOLAMI also worked at UIS from 2015 to 2018. (Ex. 1, 6:2-8).

4. GHOLAMI was a UIS Associate Professor from 2015 to 2018. She had recently been granted tenure in 2017, just prior to her resignation. (Ex. 1, 6:12-17).

5. In 2018, GHOLAMI left and went to France. (Ex. 1, 6:9-11).

10. Since returning to UIS, GHOLAMI has not applied for any other positions. (Ex. 1, 42:14-16).

11. GHOLAMI's citizenship is British. (Ex. 1, 42:17-19).

12. When GHOLAMI came to UIS in 2015, she was a British citizen at that time as well. (Ex. 1, 42:8-11).

13. GHOLAMI asserts that the MIS department head from 2015 to 2018 was also Iranian and knew she was Iranian. (Ex. 1, 43:12-22).

14. GHOLAMI spoke to Dr. Hadidi in Farsi. (Ex. 1, 44:1-4).

---

[1] An explanation of the exhibits and citations is found on the last page of this brief.

15. GHOLAMI believes that people were familiar with the fact that she was Iranian. (Ex. 1, 44:13-45:12).

16. GHOLAMI admits that no one said anything negative about her being from Iran. (Ex. 1, 45:9-12).

17. When GHOLAMI decided to leave France, the first person she contacted at UIS about her return was Provost Papini. (Ex. 1, 45:20-46:1).

18. Prior to reaching out, GHOLAMI's only contact with Provost Papini had been her exit interview in 2018. (Ex. 1, 46:16-19).

19. GHOLAMI admits that she did not really know Provost Papini at the time. (Ex. 1, 46:20-23).

20. At the time of her exit interview with Provost Papini, GHOLAMI had no personal knowledge to know what he knew or didn't know about her. GHOLAMI did not know him. (Ex. 1, 47:19-48:13).

25. GHOLAMI decided to leave France sometime after her first semester teaching there. (Ex. 1, 110:1-5).

26. Shortly thereafter, GHOLAMI decided that she wanted to return to the United States. (Ex. 1, 110:6-8).

27. GHOLAMI agrees that she would not have taken a job outside of the United States because she was planning to come back to the United States. (Ex. 1, 110:9-16).

28. GHOLAMI admits that Provost Papini indicated to her that he would serve as a positive reference for her. (Ex. 1, 111:1-23).

29. GHOLAMI agrees that she first inquired or reached out to Provost Papini about being a reference on February 7, 2019. (Ex. 1, 112:18-113:1-2; see also, Exhibit 1 to Deposition, email between Roya Gholami and Dennis Papini dated 2-7-2019).

30. GHOLAMI did not communicate with Dr. Hadidi between 2018 and the time she made efforts to return in 2019. (Ex. 1, 119:3-7).

31. GHOLAMI participated in an exit interview around March or April of 2018. (Ex. 1, 49:11-16).

33. Prior to reaching out to Provost Papini about potentially returning to the UIS, GHOLAMI had no conversations with Dean Bhattacharya. (Ex. 1, 120:5-18).

36. GHOLAMI admits that she did not interview with any institution other than UIS. (Ex. 1, 124:5-7).

38. At the time GHOLAMI communicated with Provost Papini about coming back to UIS, she had already told NEOMA, the University in France, that she was leaving. (Ex. 1, 124:8-11).

39. GHOLAMI knew at the time of her discussion with Provost Papini in 2019 that she did not have a job for the fall of 2019. (Ex. 1, 124:8-15).

40. GHOLAMI needed a job. (Ex. 1, 124:12-18).

41. GHOLAMI claims that she reached out to Provost Papini around March of 2019 asking if it was possible for her to come back to UIS. (Ex. 1, 124:19-125:12).

6

43. A vote occurred of the business college which resulted in a favorable vote allowing GHOLAMI to return to the UIS. (Ex. 1, 130:1-131:7).

44. GHOLAMI asserts that a coworker, Mr. Wang, contacted her at some point. GHOLAMI claims that he was angry in his messages and calls with her. (Ex. 1, 131:10-132:24).

45. GHOLAMI admits that Mr. Wang was a colleague and coworker. (Ex. 1, 132:7-9).

47. GHOLAMI admits that Mr. Wang was aware that she was not happy with certain aspects of the business college at UIS. (Ex. 1, 133:3-6).

49. GHOLAMI communicated with Mr. Wang using WhatsApp. (Ex. 1, 141:1-142:24).

50. In order to communicate with WhatsApp, one party would need to send their request to the other person to join. (Ex. 1, 141:21-24).

51. GHOLAMI does not recall who sent the request to the other person. (Ex. 1, 142:1-143:24).

52. GHOLAMI admits that prior to April of 2019, she told her former coworker, Mr. Wang, that she decided to take UIS to court for sexual harassment and discrimination. (Ex. 1, 146:1-5).

53. At the time of communicating with Mr. Wang regarding her intentions, GHOLAMI had not filed any IDHR complaints. (Ex. 1, 146:17-21, 147:1).

56. GHOLAMI agrees that her lawsuit at issue relates to her employment beginning in 2019. (Ex. 1, 148:15-18).

7

57. GHOLAMI agrees and admits that she did not file a lawsuit with respect to the issues that occurred prior to 2019. (Ex. 1, 148:15-24).

59. GHOLAMI agrees that her discussions with Mr. Wang in April of 2019 included her reaction and discussions suggesting she was extremely disappointed and sad about her experience at UIS. (Ex. 1, 168:12-17).

60. At the same time that GHOLAMI is complaining about how she is very disappointed, sad and unhappy with her experiences at UIS, she is negotiating and trying to come back to UIS. (Ex. 1, 168:18-23).

62. Despite GHOLAMI's understanding and feelings of ongoing issues at UIS, she continued to negotiate with them to return. (Ex. 1, 170:1-8).

63. GHOLAMI admits that she received an offer of employment from Dean Bhattacharya on May 3, 2019. (Ex. 1, 171:17-20).

64. GHOLAMI believes her conversations with Mr. Wang (and Yazan Alnsur) occurred before the meeting to vote to allow her to return. (Ex. 1, 173:1-5).

65. GHOLAMI also believes these conversations occurred prior to receiving UIS Produced 40, an email offer from Dean Bhattacharya to her for employment. (Ex. 1, 173:6-12; UIS Produced 40).

69. GHOLAMI agrees that the position she was offered was the same position that she had left in 2018. (Ex. 1, 173:22-24).

70. GHOLAMI agrees that she was offered a salary of $117,133.00. (Ex. 1, 174:1-3; UIS Produced 40).

71. GHOLAMI admits that she accepted this offer. (Ex. 1, 174:9-11; UIS Produced 40).

72. GHOLAMI admits that her acceptance of the offer does not include any conditions to the offer. (Ex. 1, 174:12-175-1).

75. After GHOLAMI accepted the offer, she received a formal letter which she signed. (Ex. 1, 175:14-21).

76. GHOLAMI's signature is noted at UIS Produced 53 of the formal letter at UIS Produced 52-53. (Ex. 1, 175:14-19; UIS Produced 52-53).

77. GHOLAMI admits that she signed the formal letter on May 12, 2019. (Ex. 1, 175:20-23; UIS Produced 52-53).

78. GHOLAMI then received a formal Notification of Appointment. (Ex. 1, 176:9-13; UIS Produced 54-55).

79. GHOLAMI agrees that she did not notify her unit that she did not wish to accept the appointment identified in UIS Produced 54-55 within 30 days. (Ex. 1, 176:9-177:16; UIS Produced 54-55).

80. GHOLAMI agrees that she made no indication that she did not want to work at UIS under the terms identified in her offers and letters of appointment. (Ex. 1, 178:2-8).

81. GHOLAMI began working in August of 2019 under the terms that were outlined in the offer. (Ex. 1, 178:9-15; UIS Produced 52-55).

82. GHOLAMI admits that she filed her IDHR charges in October of 2019. (Ex. 1, 178:16-18).

83. GHOLAMI admits that UIS Produced 1-4 are the IDHR charges she filed. (Ex. 1, 178:19-22; UIS Produced 1-4).

84. GHOLAMI admits that her IDHR complaint in October of 2019 refers to her complaint about her status as an associate professor. (Ex. 1, 179:17-20; UIS Produced 1-4).

85. GHOLAMI wanted to be a full professor. (Ex. 1, 179:24-180:1, 180:7-12).

86. GHOLAMI, however, accepted her position with the status as associate professor. (Ex. 1, 180:18-20).

87. GHOLAMI accepted the money that was offered to her as an associate. (Ex. 1, 180:21-22, 181:2).

88. GHOLAMI admits that she took the job in order to keep her green card. (Ex. 1, 181:13-182:2).

89. GHOLAMI admits that in order to keep her green card, she could have taken any employment at any position in the United States. (Ex. 1, 182:1-18).

90. GHOLAMI agrees that this would have included taking a position to work in the cafeteria. (Ex. 1, 182:13-15).

92. GHOLAMI admits that she did not fill out an application to begin the process of being promoted to full professor. (Ex. 1, 187:3-190:7).

93. Since GHOLAMI's return to UIS in 2019, she has not filed an application to become a full professor to date. (Ex. 1, 190:8-10).

96. This conversation with Mr. Wang occurred after GHOLAMI had already accepted the offer of employment. (Ex. 1, 202:11-15).

98. GHOLAMI identifies Ranjan Karri as a person she feels as a comparative employee. (Ex. 1, 207:20-208:5).

99. GHOLAMI agrees that Mr. Karri was promoted to full professor in 2019 after 13 years at UIS and after having completed an application to become full professor. (Ex. 1, 208:6-15).

100. GHOLAMI agrees that after completing the process, Mr. Karri was promoted. (Ex. 1, 208:16-19).

101. GHOLAMI also suggests that Mr. Wang is a comparator. (Ex. 1, 209:12-24).

102. Mr. Wang is a full professor now. (Ex. 1, 210:1-3).

108. Dean Bhattacharya did not work at UIS until 2019. (Ex. 1, 219:15-22).

110. GHOLAMI agrees that her status a full professor is not related to her annual performance review since she returned in 2019. (Ex. 1, 219:8-12).

111. When GHOLAMI returned in 2019, she came back with full tenure. (Ex. 1, 228:17-20).

112. GHOLAMI has no information to suggest that any other full professors at UIS in the business college who made full professor did not fill out an application. (Ex. 1, 235:1-6).

113. GHOLAMI agrees that she quit her job to move to France in 2018. (Ex. 1, 236:8-114).

114. GHOLAMI has been provided a contract every year since her hiring in 2019. (Ex. 1, 250:16-251:22).

115. Each one indicates that GHOLAMI may give notice within 30 days of the appointment if she chooses not to accept it which she ignores. (Ex. 1, 251:17-22).

11

116. At no time has GHOLAMI given notice that she does not wish to accept her appointment to continue her contract since 2019. (Ex. 1, 251:23-252:3, 252:7-9).

119. Professor Wang is a full professor but not in a managerial position. (Ex. 1, 260:24-261:2).

121. GHOLAMI admits that she had to return to the United States and no other option. (Ex. 1, 183:8-10).

124. GHOLAMI admits that Dean Bhattacharya did not change the terms of the offer that had been made to her after she reported this information. (Ex. 1, 184:22-185:2).

125. GHOLAMI had no contract with the school requiring her to be rehired in 2019. (Ex. 1, 186:16-19).

126. GHOLAMI's counsel stipulates that there was no legal obligation for the school to rehire her. (Ex. 1, 186:16-187:2).

129. Dennis Papini was the Provost and Vice Chancellor from Academic Affairs from the fall of 2017 through January of 2023. (Ex. 2, 8:2-9:16).

130. When Provost Papini came to the UIS, he had no personal relationship with GHOLAMI. (Ex. 2, 13:25-14:4).

131. Provost Papini conducted an exit interview with GHOLAMI. (Ex. 2, 15:4-6).

132. No one else was present for that interview. (Ex. 2, 15:7-9).

133. At the time of the exit interview, Provost Papini was not aware of any complaints or criticisms of GHOLAMI from her college. (Ex. 2, 16:1-4).

135. Provost Papini did not discuss GHOLAMI's complaint about Dr. Hadidi with Dean Bhattacharya when he came to the university. (Ex. 2, 19:1-18).

136. According to Provost Papini, the issues of Dr. Hadidi's leadership in the MIS department resolved itself when he retired from the university. (Ex. 2, 23:8-17).

137. Provost Papini verbally indicated to GHOLAMI that if she were willing to return should Dr. Hadidi depart that the university would welcome her. (Ex. 2, 25:5-15).

139. Provost Papini admits that the rehiring process for GHOLAMI was different for her. The usual search process was not followed. He believes a search waiver was obtained. (Ex. 2, 26:17-27:9).

140. Dean Bhattacharya was responsible for negotiating the contract with GHOLAMI. (Ex. 2, 28:25-29:5).

141. These terms would be subject to approval by the Provost. (Ex. 2, 29:6-7).

142. When GHOLAMI was rehired, she was rehired as an associate professor. (Ex. 2, 30:1-24).

143. When GHOLAMI resigned, she had just recently been promoted to associate professor and awarded tenure. (Ex. 2, 30:15-19).

144. Provost Papini approved the contract that GHOLAMI signed regarding her rehire as an associate professor and her salary. (Ex. 2, 31:23-32:2).

145. GHOLAMI was given tenure upon her return to the university. (Ex. 2, 32:8-11).

13

147. Since GHOLAMI's return to the university, she has not followed the process to be promoted to full professor. (Ex. 2, 32:22-33:1).

148. Provost Papini has encouraged GHOLAMI to apply for full professorship. (Ex. 2, 33:2-5).

149. To Provost Papini's knowledge, no one has indicated to GHOLAMI that she cannot apply to be a full professor. (Ex. 2, 33:15-18).

150. Somnath Bhattacharya is the dean of the College of Business and Management and Professor of Accounting. (Ex. 3, 7:18-22).

151. Dean Bhattacharya has been working at UIS since February of 2019. (Ex. 3, 7:23-8:3).

152. Dean Bhattacharya learned that GHOLAMI expressed some interest in returning to UIS. (Ex. 3, 23:14-18).

153. Dean Bhattacharya obtained this information from Provost Papini. (Ex. 3, 23:19-24).

155. Dean Bhattacharya understood that Provost Papini supported GHOLAMI's return to the university. (Ex. 3, 25:14-24).

156. Dean Bhattacharya admits that GHOLAMI wrote to him in his capacity as the new dean expressing her desire to return to the MIS department and to UIS. (Ex. 3, 26:1-9).

157. Between the time that Dean Bhattacharya spoke to Provost Papini and the time that he communicated with GHOLAMI, he does not recall communicating with anyone else about GHOLAMI's potential return to the university. (Ex. 3, 26:10-20).

158. After GHOLAMI left the university, Dean Bhattacharya was not aware of any ongoing process to fill GHOLAMI's position prior to her reaching out to return. (Ex. 3, 29:1-30:24).

160. First, the Provost would have to sign off on the position and then Dean Bhattacharya would have to ask the department to waive the search through a vote. (Ex. 3, 32:9-22).

161. This would require agreement by Provost Papini and the faculty members at the time. (Ex. 3, 33:1-23).

163. The Provost suggested that we have her return with tenure and Dean Bhattacharya agreed. This was affirmed by a vote through the department. (Ex. 3, 50:1-6).

170. Within the College of Business, Dean Bhattacharya is not aware of any other professors who have quit and come back other than GHOLAMI. (Ex. 3, 60:9-16).

171. Individuals who arrive from different institutions are not able to dictate their title as far as rank when they come into the facility. (Ex. 3, 60:17-21).

172. GHOLAMI signed the offer letter and countersigned the agreement indicating her willingness to return along with the terms and conditions that were laid out to her. (Ex. 3, 61:1-8; UIS Produced 52-53).

173. The terms outlined in UIS Produced 52-53 were negotiated between Dean Bhattacharya and GHOLAMI with approval from Provost Papini. (Ex. 3, 61:17-20).

177. UIS Produced 29-32 are the relevant sections of the UIS personnel

15

Policy regarding promotion. (UIS Produced 29-32).

**B. Facts Gholami Disputes**

6.  GHOLAMI decided to leave France and return to the United States in order to maintain her immigration status. (Ex. 1, 36:19-37:15).

**Response:  Gholami testified that there were several reasons why she decided to leave France. She explained that there was social unrest in France at the time. Doc. 22-6 at 33-36. Ultimately, she explained that her immigration status was critical to her and that she never had intended to stay in France for long. Doc. 22-6 at 36-37.**

7.  GHOLAMI does not recall the exact number of institutions she applied to upon deciding she wanted to leave France. (Ex. 1, 39:3-24).

**Response:  This oversimplifies Gholami's testimony. She testified that at the moment of her deposition she could not recall the exact number of institutions she applied to, however, she stated that five would be a good estimate. Doc. 22-6 at 39.**

8.  GHOLAMI admits that all of the institutions she did apply to after deciding to leave France were within the United States. (Ex. 1, 39-13-17).

**Response:  This again oversimplifies Gholami's testimony. She explained that she only applied to schools in the United States but schools in other nations recruited her. Doc. 22-6 at 39-40.**

9. Only UIS offered GHOLAMI a position. (Ex. 1, 40:7-9).

Response:   See response to paragraph 8.

21. GHOLAMI's claim of harassment involving Dr. Hadidi relates to a date in 2016 when he asked her to go to lunch with him. (Ex. 1, 76:16-21; pages 75-79 generally; 78:6-7).

**Response:  Gholami is not brining a legal claim of sexual harassment. She contends that she was subjected to sexual harassment by Dr. Hadidi. See infra Plaintiff facts 34-39.**

22. GHOLAMI claims that Dr. Hadidi stared at body parts. (Ex. 1, 81:16-19).

16

**Response: See paragraph 21.**

23. GHOLAMI did not say anything to Dr. Hadidi when she observed this. (Ex. 1, 81:23-82:1).

**Response: See paragraph 21.**

24. GHOLAMI admits that Dr. Hadidi did not promise her anything during this lunch. (Ex. 1, 83:13-15).

**Response: See paragraph 21.**

32. GHOLAMI claims that she wanted to relay to Provost Papini her claims of sexual harassment by her department head, Dr. Hadidi, and the culture in general. (Ex. 1, 50:2-8).

**Response: Gholami disputes this statement because it is incomplete. She testified that she wanted to speak with Papini about "basically sexual harassment by the department head and the culture in general, board leadership, broken performance evaluation process, sexism, misogyny, everything that I experienced, abuse of shared governance." Doc. 22-6 at 50.**

34. GHOLAMI agrees that Dean Bhattacharya was the main person she was talking to about potentially returning to the UIS and the terms for a potential return. (Ex. 1, 121:2-122:4).

**Response: This is largely accurate but slightly misstates Gholami's testimony. She stated that she believed that Dean Bhattacharya was the person who would make the ultimate decision about the terms of her return. Doc. 22-6 at 121-22.**

35. GHOLAMI applied for a few positions in addition to UIS but did not receive offers from research institutions due to her limited profile. (Ex. 1, 122:5-15).

**Response: This statement is denied because it misconstrues Gholami's testimony and, if it were accurate, it wouldn't be admissible evidence**

17

**because it would be an opinion. Gholami testified that research institutions typically have higher publication requirements and she wouldn't be able to meet that threshold. Doc. 22-6 at 122-123. Her opinions as to why she was not interviewed are not admissible because they are not based upon her personal knowledge. Rather, they are speculative.**

37. GHOLAMI claims to have applied at five other institutions but was not offered a position or even an interview at any of them. (Ex. 1, 123:19-124:7).

**Response:  This inaccurately references her testimony. She testified that she did not recall how many institutions she applied for, indicating that five sounded like a reasonable number. Doc. 22-6 at 123-124.**

42. GHOLAMI admits that Provost Papini indicated he would discuss her inquiry with the dean and the college and that they would follow the procedures to hire or rehire someone. (Ex. 1, 125:13-21, 126:12-18, 127:12-128:8).

**Response:  This slightly misstates Gholami's testimony. Gholami explained that she had the conversations with Papini, he was supportive of her returning, and he would discuss it with the dean and the college. She did not say that they would follow the "procedures to hire or rehire someone." Doc. 22-6 at 127-128.**

46. GHOLAMI admits that she communicated with Mr. Wang after she left UIS and complained about other people at UIS to him before coming back in 2019. (Ex. 1, 132:16-133:2).

**Response:  This misconstrues the nature of the complaints Gholami made to Mr. Wang. She explained that she did complain to him about sexual harassment within the Department. Doc. 22-6 at 132-133. Further, these complaints were made to him in September of 2016. Doc. 22-6 at 133. These were not just generalized complaints.**

48. GHOLAMI admits that Mr. Wang indicated that his anger was related to her failure to inform him that she was returning to UIS. (Ex. 1, 134:6-21).

**Response:  This statement is misleading and lacks context. Gholami explained that Mr. Wang contacted her in April of 2019. While she said he told her that he was angry because she didn't tell him he was coming back, but she didn't believe that was why he was angry. Doc. 22-6 at 134.**

54. GHOLAMI agrees that anything she was referencing with respect to sexual harassment and discrimination which formed the basis of her decision to take UIS to court related to events that occurred prior to April of 2019. (Ex. 1, 147:2-12).

**Response:  This statement is disputed because it lacks context. Gholami did advise Mr. Wang that she wanted to sue for sexual harassment. Ultimately, that is not what this case is about and her desires are largely irrelevant to this proceeding. Doc. 22-6 at 148.**

55. All of GHOLAMI's conversations with Mr. Wang (Tewei Wang) related to events that occurred while she had worked at UIS between 2015 and 2018. (Ex. 1, 147:1-148:10).

**Response:  This statement is disputed because it is not really clear what it is claiming. In April of 2019 Gholami clearly communicated with Mr. Wang about sexual harassment and discrimination when she had previously been employed at UIS. Her testimony does not support the conclusion that this is the only thing she discussed with Mr. Wang. It is true that her complaints about UIS that she made to him in April 2019 related to her previous work experience at UIS. Doc. 22-6 at 146-148.**

58. GHOLAMI agrees that her conversations with Mr. Wang occurred during a time that she was not working at UIS. (Ex. 1, 159:6-9).

**Response:  Gholami disputes this statement because it is not clear what time frame is being referenced. She certainly acknowledges that she communicated with Mr. Wang during the period of time she was not working at UIS.**

61. GHOLAMI claims that she made efforts to come back to UIS hoping that there would be change with new leadership. (Ex. 1, 169:1-19).

19

**Response:  This statement is largely correct, but it oversimplifies Gholami's testimony. She stated "I was hoping there would be change. I could see the potential with the right leadership. I thought I could contribute to change of culture and leadership." Doc. 22-6 at 169.**

66. GHOLAMI admits that the information contained in UIS Produced 40 sets out her offer of employment which includes a position as associate professor at UIS. (Ex. 1, 173:17-21; UIS Produced 40).

**Response:  UIS produced 40 is the same as Doc. 22-3. It is an email that summarizes the offer to Gholami and does not outline all of the terms of the employment. Further, it is not a formal offer. The actual terms of the offer were subsequently written in an offer letter dated May 3, 2019. Doc. 22-4. Further, the notification of appointment contains the critical terms of her employment. Doc. 22-5.**

67. On April 9, 2019, Dean Bhattacharya offered GHOLAMI a position as an associate professor at UIS. (Ex. 1, 17-21; UIS Produced 40).

**Response:  See response to paragraph 66.**

68. GHOLAMI agrees that she received this offer as stated. (Ex. 1, 173:17-21; UIS Produced 40).

**Response:  See response to paragraph 66.**

73. GHOLAMI admits that after the negotiations, the offer noted in UIS Produced 40 is the one that was final and made to her. (Ex. 1, 175:1-9; UIS Produced 40).

**Response:  See response to paragraph 66.**

74. GHOLAMI accepted this offer as stated in UIS Produced 40. (Ex. 1, 175:1-13; UIS Produced 40).

**Response:  See response to paragraph 66.**

20

91. UIS had no legal obligation to offer GHOLAMI a position in 2019. (Ex. 1, 186:5-19).

**Response:  While this statement is undoubtedly true, there is nothing to suggest that Gholami could competently testify to what UIS' legal obligations were. For that reason, it is disputed.**

94. GHOLAMI understands that as long as she does not apply she is not going to be elevated to full professor. (Ex. 1, 190:19-21, 191:1).

**Response:  This statement is disputed because it is misleading. The question referenced what occurred after she returned to UIS and not the process of returning to UIS. Doc. 22-6 at 185-193.**

95. GHOLAMI believes that her terms of her employment offer were impacted by her Iranian national origin is based upon a conversation she had with Mr. Wang after she returned. (Ex. 1, 201:20-202:2).

**Response:  Gholami testified that her conversation with Mr. Wang was one of the reasons she believed her national origin played a role in the employment offer she received. Doc. 22-6 at 201-202.**

97. GHOLAMI agreed that Mr. Wang suggested that she was treated more favorably because of her national origin and because of her sex and gender. (Ex. 1, 203:1-204:21).

**Response:  This is not what Gholami stated. She stated that Mr. Wang suggested to her that she was treated more favorably because of her national origin. Doc. 22-6 at 204.**

104. GHOLAMI also agrees that these individuals completed the application and that they each may have been rejected first before becoming full professors. (Ex. 1, 210:15-21).

**Response:  Gholami objects to this statement because it is misleading if it is attempting to suggest that anyone had previously been rejected. Gholami's testimony made it clear that she does not know if they were previously rejected, only that it was possible. Doc. 22-6 at 210.**

21

105. GHOLAMI agrees that a majority of the people who may apply for full professorship may be declined the first time. (Ex. 1, 210:22-211:2).

**Response:  Gholami testified that some people might not be promoted on their first attempt. She indicated that the process was political. She did not testify, nor would she have the ability to testify competently, that the majority of people who applied were denied on their first attempt. Doc. 22-6 at 210-11.**

106. GHOLAMI believes that both Mr. Wang and Dr. Li, her alleged comparators, were both denied full professorship the first time they applied. (Ex. 1, 211:6-9).

**Response:  This inaccurately reflects Gholami's testimony. She testified that it was possible, not likely, that Dr. Wang and Dr. Li both were denied the first time they applied. Doc. 22-6 at 211.**

107. GHOLAMI has no evidence to support her claim that her gender played a role in the terms of the offer made to her by Dean Bhattacharya in April of 2019. (Ex. 1, 214:21-216:22).

**Response:  This is not an accurate reflection of Gholami's testimony. She testified that there was a history with her and gender discrimination, there was a faculty split the highly favored male professors, she was qualified for the title, and other reasons. Doc. 22-6 at 215.**

109. GHOLAMI claims that the offer made to her was discriminatory is based upon a vague allegation of discrimination and her own life experiences. (Ex. 1, 217:1-8).

**Response:  See response to paragraph 107.**

117. GHOLAMI admits that she came to the conclusion that she should not have resigned and left in 2018 which prompted her to file her IDHR claim in October of 2019. (Ex. 1, 252:21-254:11).

22

**Response:  This slightly misstates Gholami's testimony. She testified that she should have filed a complaint in 2018 rather than resigning. Doc. 22-6 at 253.**

118. GHOLAMI admits that she filed this lawsuit based upon events that occurred prior to August of 2019. (Ex. 1, 254:14-17).

**Response:  This is inaccurate. Her lawsuit is clear in what it alleges. Doc. 1. She testified that the fact that she had been discriminated against during the first period of time she was at UIS was no different. When she was denied the full professorship it was more of the same. Doc. 22-6 at 252-54.**

120. GHOLAMI admits that she attempted to use her claims of sexual harassment as the basis and context for resigning in the first place as some sort of negotiation leverage when negotiating with Dean Bhattacharya. (Ex. 1, 182:23-183:7).

**Response:  This is not what Gholami stated. She testified "I tried to negotiate my rank and salary on my return, and he refused to consider my credentials, prior credentials, and the context of [why] I resigned and left, sexual harassment and everything else. He said you are not qualified to return as a full professor, that's it." Doc. 22-6 at 183.**

122. GHOLAMI believed it was important for Dean Bhattacharya to know the context of her resignation and inserted this information into the negotiation process in an effort to improve her negotiation abilities. (Ex. 1, 183:2-184:21).

**Response:  See response to paragraph 120.**

127. GHOLAMI did not fill out an application because she assumed it would be unsuccessful. (Ex. 1, 194:1-24).

**Response:  This statement is denied because it is not clear what time frame it is referencing. Gholami testified that after her return to UIS, she never filled out an application seeking to be promoted to a full professor.**

23

128. GHOLAMI accepted the offer outlined by Dean Bhattacharya on April 9, 2019, as set forth in UIS Produced 40. (UIS Produced 40).

**Response:  See response to paragraph 66.**

134. Provost Papini admits that GHOLAMI reported to him that she was uncomfortable around Dr. Hadidi, the head of the MIS department, who had asked her to lunch once and she declined, which made her uncomfortable. (Ex. 2, 16:5-17:2).

**Response:  Gholami also specifically discussed sexual harassment during the meeting. Doc. 22-6 at 56.**

138. Provost Papini does not recall expressing to Dean Bhattacharya the specific reasons as to why GHOLAMI had left UIS originally. (Ex. 2, 27:7-9).

**Response:  Dean Bhattacharya testified specifically that he had been told by Dr. Papini that Gholami accused Hadidi of sexual harassment and that was the reason she left. Doc. 22-8 at 7, Dep. p. 23-24.**

146. Typically, when professors are hired, most, but not all, would have to work at the university for a certain period of time before being given tenure. (Ex. 2, 32:12-17).

**Response:  This statement is disputed. Provost Papini testified to a leading question from UIS' counsel as to this point. Upon further testimony, he acknowledged that professors are hired at UIS and given tenure. Doc. 22-7 at 34.**

154. 154. Dean Bhattacharya understood that GHOLAMI had a change of heart with respect to her present employment in Europe and wanted to return to UIS. (Ex. 3, 25:2-8).

**Response:  It is unclear what purpose this statement is offered for. If merely to demonstrate what Dean Bhattacharya was told, it is not objectionable. If offered for its truth, it is hearsay because it references a communication he had with Provost Papinini. Doc. 22-8 at 8, Dep. p. 25.**

159. The authorized process for GHOLAMI returning to the university with no open posted position would require that the Provost grant the position to the department chair typically. (Ex. 3, 31:1-32:8).

**Response: This statement inaccurately reflects Dean Bhattacharya's testimony. He didn't mention the term "authorized process." What he discussed was the normal way a vacancy is filled versus the way it was filled in this situation. Doc. 22-8 at 9, Dep. at 31-32.**

162. Dean Bhattacharya agrees that GHOLAMI returned with tenure but that the university was not required to have her return with tenure. (Ex. 3, 49:11-24).

**Response: This statement is disputed because it is not clear what UIS means when it says it was not required that Gholami return with tenure. Gholami agrees that there were no rules in place that mandated she return with tenure.**

165. Dean Bhattacharya agrees that it was his decision with agreement by Provost Papini to bring GHOLAMI back as an associate professor. (Ex. 3, 51:24-52:5).

**Response: This statement is largely correct, but the cited material states that Provost Papini "vetted" the decision to return her as an associate professor. Doc. 22-8 at 14, Dep. p. 52.**

166. Dean Bhattacharya relied upon Article 6 of the policies and procedures produced as UIS Produced 29-32 in determining how someone could be considered for associate professor or full professor. (Ex. 3, 52:11-54:13; UIS Produced 29-32).

**Response: This denial will be detailed more thoroughly in the brief. Doc. 22-2 accurately outlines the policies for assessing promotion to the rank of full professor. In part, it provides that "[a] faculty member will have served at least six (6) years as an Associate Professor at the University or at a comparable institution and have completed two (2) years of full-time**

**continuous service at the University in the rank of Associate Professor before being awarded the rank of professor." Gholami satisfied these criteria.**

167. Dean Bhattacharya based his determination of GHOLAMI's status based upon his reading of the policy. (Ex. 3, 54:14-17).

**Response:  See response to paragraph 166.**

168. Dean Bhattacharya is not aware of the specific process for professors who have quit and come back. (Ex. 3, 60:3-8).

**Response:  Largely see response to paragraph 166. The policy at 22-2 deals with professors who return to UIS.**

169. There is no formal specific process for that category of individual. (Ex. 3, 60:9-12).

**Response:  See response to paragraph 168.**

174. Typically, faculty members join as an assistant professor if they have a PhD already completed. (Ex. 3, 44:7-12).

**Response:  This statement is denied because it leaves out an important clarification in the testimony. Dean Bhattacharya testified that people with PhD's join as an assistant professor when they are "early in their career." Doc. 22-8 at 12, Dep. at 44.**

175. Dean Bhattacharya's understanding of the promotion terms for UIS includes that a tenured associate professor has a six-year minimum period before becoming eligible to apply for a promotion to full professor. This is not a given but a minimum standard before promotion to full professor. (Ex. 3, 44:10-45:8).

**Response:  See response to paragraph 166, See doc. 22-2.**

26

176. Dean Bhattacharya indicated that he agreed that his understanding and bases for promotion was UIS Produced 29-32. (UIS Produced 29-32).

**Response:  Doc. 22-2 outlines the policies for promotion at UIS.**

178. Candidates for promotion consideration have the burden of proof and documentation. Each candidate shall be responsible for the preparation of a portfolio for promotion that documents eligibility and satisfaction of the criteria for the rank sought as specified in this policy. (UIS Produced 29).

**Response:  This mischaracterizes the policy.**

**C. Gholami's Additional Statements of Undisputed Facts**

**Relevant Structure of UIS**

1. The UIS is one of three campuses of the University of Illinois. It is governed by the University of Illinois Board of Trustees.

https://www.uis.edu/about/leadership (Last visited May 27, 2025).

2. UIS has four colleges: College of Arts and Sciences, College of Education, college of Business and Management, College of Public Affairs. Doc. 22-7 at 12.

3. Within the College of Business and Management is the Department of Management Information Services ("MIS"). Ex. 4 at 28, *see also*

https://www.uis.edu/mis (Last visited May 27, 2025).

4. The MIS degree program at UIS focuses on providing a balance between technical skills and knowledge of business functions and processes.

https://www.uis.edu/mis/about-mis (Last visited May 27, 2025).

5.  Each college has a dean. The role of dean is comparable to that of a CEO of a small company. The dean is in charge of the administrative and financial aspects of the college. Doc. 22-8 at 3, dep. p. 8.

6.  As of February 2019, Somnath Bhattacharya has been the dean of UIS' College of Business and Management. Doc. 22-8 at 3, dep. p. 7.

7.  The dean of the College of Business and Management reports to the UIS Provost who, in turn, reports to the chancellor. The chancellor reports to the president of the University of Illinois, who then reports to the board of trustees. Doc. 22-8 at 4, dep. at 9, Ex. 4 at 28.

8.  Dennis Papini served as the provost at UIS from fall of 2017 until January 2023. Doc. 22-7 at 8.

9.  The provost serves as UIS' chief academic officer. Doc. 22-7 at 8.

10. At the time Gholami initially came to UIS, Dr. Rassule Haididi was the MIS department chair. Doc. 22-6 at 43-44.

11.    There are three levels of professor at UIS. The first is the assistant professor; the second is the associate professor; and the third is the full professor.  22-8 at 13, dep. at 46.

12.    At UIS tenure is an indefinite appointment the faculty. 22-8 at 13, dep. at 46.

13. While not always, UIS hires professors and gives them tenure when they initially start at the university. Doc. 22-7 at 34.

**Gholami's professional background**

14. Gholami is a British citizen who was born in Iran. Doc. 22-6 at 43-35.

28

15. In 1997, Gholami received a B.Sc. in Applied Mathematics in Computer Science at K.N. Toosi University of Technolgy in Tehran, Iran. Ex. 2 at 24.

16. In 2006 Gholami received a Ph.D. in Management Information Systems from the National University of Singapore. Ex. 2 at 24.

17. In 2009 Gholami received a Postgraduate Professional Certificate in Leraning in Heigher Education from Aston University in the United Kingdom. Ex. 2 at 24.

18. From 2001-2005 Gholami was a Research Scholar at the University of Singapore.

19. From 2005 until 2011, Gholami served as a tenure track assistant professor at Aston Business School in the United Kingdom. Ex. 2 at 23, 32.

20. Aston is a triple accredited business school and a research/balanced institution. Ex. 2 at 32.

21. In 2011 Aston promoted Gholami to an associate professor and granted her tenure. Ex. 2 at 32.

22. Gholami remained at Aston until she came to UIS in 2015. Ex. 2 at 32. While on sabbatical from Aston, she served as a visiting associate pressor at Carenegie Mellon University in the Spring of 2015. Ex. 2 at 23.

23. After she left UIS in 2018, Gholami went to the NEOMA Business School in France as a full professor. Doc. 2 at 32.

24. Like Aston, NEOMA is a triple accredited business school. Doc. 2 at 32.

25. Triple accreditation in management education, also known as triple-crown accreditation, describes a business school accredited by three major

29

accreditation bodies: The Association to Advance Collegiate Schools of Business (AACSB), the Association of MBAs (AMBA), and EFMD Quality Improvement System (EQUIS). About 1% of Business Schools worldwide are triple-accredited and ab out 6% of Business Schools hold AACSB accreditation. Aston Business School (and NEOMA Business School) is triple-accredited and UIS is only AACSB accredited. Aston University and NEOMA Business School are both balanced institutions or R2/DPU . Ex. 1 at 2.

**Gholami's first period of employment at UIS**

26. Gholami was recruited to come to UIS by Dr. Haididi. Ex. 1 at 2.

27. In March 2015 Gholami interviewed to come to UIS. During that interview Dr. Haididi told her that if she came to UIS she would be evaluated for tenure in 2016 and promoted to the rank of full professor shortly thereafter. Ex. 1 at 2.

28. During her interview, Dr. Haididi told Gholami she would have to be at UIS for two years before she could be awarded tenure. She could not be hired in with tenure because of previous "troublemakers" from Iran and Korea who had caused problems at UIS. Ex. 1 at 2.

29. Dr. Hadidi emailed Gholami and confirmed she had to be at UIS for two years before she would be promoted to a full professor. Ex. 2 at 141.

30. Gholami was hired as an associate professor and commenced teaching at UIS in the fall of 2015. Doc. 22-6 at .

31. Ultimately, Dr. Haididi told Gholami Rassule Hadidi that she was hired due to her strong profile, scholarship, international experience, and to fulfill gender and racial diversity requirements. Ex. 2 at 136.

32. During her initial tenure at UIS, Gholami spoke with her colleague Tewei Wang and complained that Dr. Haididi was sexually harassing her. Doc. 22-6 at 82.

33. On September 13, 2016, Dr. Haididi invited Gholami to join him for the UIS Alumni Gala scheduled for October 21, 2016. Ex. 3 at 229-230.

34. In September 2016, Gholami was first sexually harassed by Dr. Haididi. Ex. 1 at 3.This incident occurred at a country club in Springfield, Illinois. Doc. 22-6 at 75.

35. Haididi told Gholami that he wanted to have a physical relationship with her. Doc. 22-6 at 76. Gholami believed this was sexual harassment and told him that she was not interested. Doc. 22-6 at 80.

36. Gholami believed that based upon UIS guidelines, a supervisor asking out a subordinate constituted sexual harassment. Doc. 22-6 at 81.

37. After the luncheon, Dr. Haididi wrote to Gholami in broken Farsi asking when they could start dating. Doc. 22-6 at 85.

38. On September 18, 2016, an hour after Haididi's email and shortly after Haididi asked her to have a physical relationship, Gholami followed up in writing advising that she wanted to keep their relationship professional. Ex. 3 at 223, Doc. 22-6 at 294.

39. On several occasions, Dr. Haididi stared at Gholami's body parts in a sexual manner. Doc. 22-6 at 82-83.

40. By a vote of 9-0, on October 25, 2016, the MIS Department Executive Committee recommended that Gholami be granted tenure. Ex. 2 at 219-225.

41. On November 29, 2016, the College Executive committee recommended Gholami for tenure. Ex. 2 at 213-217.

42. In its recommendation, the Executive Committee stated "Gholami has established an excellent portfolio of teaching, advising, and service records and an outstanding research record." It concluded, The College of Business and Management Personnel Committee believes that Dr. Gholami has demonstrated excellence in teaching, and high quality in the combined areas of scholarship and service, and therefore should be granted tenure." Ex. 2 at 217.

43. On January 3, 2017, then dean Ronald McNeil recommended Gholami for tenure at UIS. In making this recommendation he noted that "Dr. Gholami has the highest number of citations in the College of Business and Management" since 2011." He further wrote "She clearly exceeds the AACSB requirements for a Scholarly Academic qualified faculty member at the graduate and undergraduate levels. Her scholarship productivity certainly increases the overall College of Business and Management's publication profile." Ex. 2 at 171-175.

44. Dean McNeil also noted that Gholami would be the first female MIS professor to receive tenure. Ex. 2 at 26.

45. Dean McNeil's recommendation concluded by stating "the MIS Department Executive Committee members who were present at the meeting unanimously and enthusiastically recommend Dr. Gholami be granted tenure at UIS." Ex. 2 at 26.

46. On February 17, 2017, UIS' Tenure Review committee recommended Gholami be granted tenure. Ex. 2 at 229-231.

47. The tenure committee noted that Gholami was the "most read author from UIS" and "has the highest number of citations in the College of Business and Management." The Committee concluded "these are exceptional achievements." Ex. 2 at 230-231.

48. A formal recommendation for Gholami's tenure was made to the Chancellor on March 21, 201 Ex. 2 at 232-36.

49. On April 13, 2017, the chancellor let Gholami know she agreed with the tenure recommendation. Ex. 2 at 236.

50. In April of 2017 Gholami reported sexual harassment to the president of the UIS Faculty Union, Kristi Barnwell. Ex. 1 at 4. Thereafter, on April 6, 2017, Barnwell wrote to UIS administration about significant issues Roya Gholami is facing and suggests a meeting to discuss the matter and find a way forward. Ex. 3 at 273.

51. When nothing was done about this concern and it went unaddressed, Ghoalmi concluded that she had no option other than leaving UIS. Doc. 22-6 at 54-55.

33

52. On July 13, 2017, the Board of Trustees of the University of Illinois approved that Gholami be granted indefinite tenure. Ex. 2 at 237.

53. On March 20, 2018, Gholami notifiesd UIS that she has been offered a position as a full professor at a business school in Paris, France, and she has accepted the offer. Ex. 3 at 274.

54. On March 23, 2018, Gholami sent a letter informing UIS that she would be resigning her position as an Associate Professor effective August 15, 2018. Ex. 3 at 252.

55. On March 26, 2018, Haididi wrote Gholami indicating she was a "very valuable member of the MIS Department and campus community" and letting her know they could look into possibly matching her offer. Ex. 4 at 37.

56. On March 27, 2018, the Provost's office requested information form Haididi about Gholami's new job. Ex. 3 at 255.

57. Haididi passed along the request to Gholami. Ex. 3 at 259.

58. On March 27, 2018, Gholami shared details of her job offer from NEOMA Business School with Rassule Hadidi and Renee Clausner. The offer included a full professorship, a gross annual salary of €90,000, an annual research budget of €4,000, and other benefits. Gholami emphasizes that money was not the sole factor in her decision to leave UIS. Ex. 3 at 251, 556.

59. When Gholami resigned, Provost Papini asked her to do an exit interview with him. Doc. 22-7 at 15.

60. Papini explained that he does not typically do exit interviews, but when "valued professors" leave he wants to get an understanding of why they are leaving. Doc. 22-7 at 16.

61. Papini wanted to meet with Gholami because he considered her to be a valuable member of the faculty, and he wanted to know if there was anything that could be done to keep her. Doc. 22-7 at 16.

62. During the meeting with Papini, Gholami shared with him her concerns about Haididi. Doc. 22-7 at 17.

63. Gholami expressly addressed the concerns she had about Hadidi's sexual harassment. Doc. 22-6 at 50, 57.

64. During the exit interview, Papini asked Gholami if she would consider returning if Haididi were no longer the head. She indicated that she would. Doc. 22-7 at 18.

65. Even before Gholami brought information to him, Papini had concerns about Haididi's "autocratic leadership style." Doc. 22-7 at 18.

66. Papini had previously heard from other faculty members about Haididi, but they were afraid he would retaliate against them if they knew he was speaking to the Provost. Doc. 22-7 at 22.

67. After the meeting Papini passed along Gholami's concerns to UIS' legal counsel. Doc. 22-7 at 19.

68. On April 12, 2018, Gholami posted on social media that she had accepted  a position at NEOMA beginning that fall.

35

69. Gholami's resignation became effective in May 2018. Doc. 22-6 at 62.

70. During the academic year of 2018-2019, Gholami was at NEOMA. Ex. 22-6 at 27-28.

**Gholami's return to UIS**

71. Haididi announced he would be retiring. At that time, Papini wrote to Gholami to advise her that Haididi was leaving told her she should return to UIS. Doc. 22-7 at 24, 25.

72. Bhattacharya became dean in February 2019. Doc. 22-8 at 7, dep. p. 23.

73. Shortly after he returned, Bhattacharya was told by Papini that Gholami was interested in returning because Haididi was leaving. Doc. 22-8 at 8, dep. p. 21-23, Doc. 22-7 at 27.

74. Papini told Bhattacharya that Gholami left because Haididi had been harassing her. Doc. 22-8 at 7, dep., p. 24.

75. On April 3, 2019, Gholami wrote to Dr. Bhattacharaya and explained that part of the reasons she left UIS in 2018 was because of "sexual harassment by my line manager." Ex. 4 at 39.

76. Bhattacharya told Papini that he had reservations about bringing Gholami back because she previously left. Doc. 22-8 at 10, dep. at 33.

77. To Bhattacharya, his boss Papini seemed "very keen to have Dr. Gholami return." Doc. 22-811, dep. at 37.

36

78. On April 10, 2019, Papini wrote to Ghoami telling her that he "considered it a loss when [she] left, and I consit a gain should you decide to return." Ex. 4 at 46.

79. The process for a faculty member to return to UIS is for the Department (co-workers) to vote on whether the former employee should be re-hired. If approved, the Dean can then negotiate the details of the re-hire. Ex. 3 at 168.

80. Before the vote, Gholami received a telephone call from Tewei Wang, a MIS professor. He yelled at her and told her not to come back. Doc. 22-6 at 131.

81. During her original tenure, Gholami told Wang she had been sexually harassed by Haididi. Ex. 5 dep. p. 11-12.

82. Wang told Gholami not to return because she was not happy at UIS, and he didn't think she would be happy returning. Ex. 5 dep. p. 15-16.

83. Bhattacharya ultimately supported Papini's desire that Gholami returning to UIS because of what Papini said and because of her CV. Doc. 22-8 at 11, dep. at 37-38.

84. Haididi expressed little opinion about Gholami returning. He told Bhattacharya "if that is what you want." Doc. 22-8 at 11, dep. at 40.

85. During the Department meeting to vote on Gholami's return, Wang stated he was opposed to her returning because she had not been happy when was there. Ex. 5, dep. p. 17.

86. On April 26, 2019, the MIS Department voted to return Gholami as a tenured associate professor. Ex. 4 at 48-49.

87. This vote allowed for Gholami to be hired without the position being posted. Doc. 22-8 at 12, dep. at 41.

88. Dr. Haididi officially left UIS effective August of 2019. Doc. 22-8 at 7, dep. p. 22.

89. Bhattacharya made the decision that Gholami would be brought back as an associate professor and not a full professor. Doc. 22-8 at 14, dep. at 52.

90. Bhattacharya contends that his decision was based only on the UIS policy regarding promotion. Doc. 22 at 15, dep. at 54.

91. Gholami requested that she return as a full professor. Bhattacharya denied the request and on April 3, 2019, wrote, "[w]hile I am impressed by the number of offers you have received from various institutions to join their ranks as a full professor, I am unable to extend the same to you." He explained because she did not have two years as a tenured associate professor at UIS, she was not eligible to be a full professor under Article 6, Section 3 of the faculty handbook. Ex. 3 at 386, Doc. 22-3.

92. Ultimately, Gholami accepted the offer to return as an associate professor. Doc. 22-3.

93. On May 3, 2019, Gholami signed the official offer letter. Doc. 22-4.

**UIS policy regarding eligibility for full professorship**

94. The UIS Faculty Personnel Policy states that a candidate for full professor must have served at least six years as an Associate Professor at the University *or a comparable institution* and have completed two years of full-time

38

continuous service at the University in the rank of Associate Professor. Doc. 22-2 at 1. (emphasis added).

95. Ranjan Karri (male/India) was made a full professor on August 16, 2019. Ex. 4 at 57-59.

96. Xiaoging Li (male/Asia) was made a full professor in 2017. Ex. 4 at 57-59.

97. Atul Argawal (male/Asia) was hired in 2019 and made a full professor six years later on August 16, 2015. Ex. 4 at 57-59.

**ARGUMENT**

**A. Standard governing this Court's consideration of a motion for summary judgment.**

The standards governing a Fed.R.Civ.P. 56 motion for summary judgment are well established. In deciding a motion for summary judgment the Court does not evaluate the weight of the evidence, judge the credibility of the witnesses, or determine the ultimate truth of the matter; instead, it is the function of this Court in ruling on a motion for summary judgment to ascertain whether there exists a genuine issue of triable fact. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A disputed fact is 'material' if it might affect the outcome of the suit under governing law." *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In determining whether a genuine issue of material fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Omnicare Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

The Seventh Circuit has reminded Courts that the role of the courts when reviewing summary judgment is not to act as a jury. *Coleman v. Donahoe*, 667 F.3d 835, 862 (7th Cir. 2012). "When ruling on a motion for summary

judgment, the party opposing the motion gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011). If there is a conflict in the evidence, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.

## B. Standards governing employment discrimination and retaliation claims

Since the United States Supreme Court decided the seminal case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), analysis of discrimination and retaliation cases has largely forced plaintiffs to utilize either a direct or an indirect method of assessing whether their employer has discriminated. In recent years, the Court of Appeals for the Seventh Circuit has begun to move away from these rigid methodologies at the summary judgment stage. This movement largely started with Judge Easterbrook's dissenting opinion in *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 893 (7th Cir. 2001). In *Gordon,* Judge Easterbrook dissented and complained that the majority's opinion illustrates that the McDonnell Douglas framework "has become some encrusted with the barnacles of multi-factor tests and inquiries that it misdirects attention." *Id.* The view that the rigid adherence to multi-factor tests was more thoroughly in Judge Wood's concurring opinion in *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (concurring opinion joined by entire panel):

> Perhaps *McDonnell Douglas* was necessary nearly 40 years ago, when Title VII litigation was still relatively new in the federal courts. By now, however, as this case well illustrates, the various tests that we insist lawyers use have lost their utility. Courts

41

manage tort litigation every day without the ins and outs of these methods of proof, and I see no reason why employment discrimination litigation (including cases alleging retaliation) could not be handled in the same straightforward way. In order to defeat summary judgment, the plaintiff one way or the other must present evidence showing that she is in a class protected by the statute, that she suffered the requisite adverse action (depending on her theory), and that a rational jury could conclude that the employer took that adverse action on account of her protected class, not for any non-invidious reason. Put differently, it seems to me that the time has come to collapse all these tests into one.

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763 (7th Cir. 2016), the Court explained that "[t]he use of disparate methods and the search for elusive mosaics has complicated and sidetracked employment-discrimination litigation for many years." The Court went on to explain that the different tests utilized in employment discrimination cases was detracting from the main question – could a jury reasonably conclude that the employment action was made for an unlawful reason:

> That legal standard, to repeat what we wrote in *Achor* and many later cases, is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action. Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled "direct" or "indirect." *Id.*

In *Malin v. Malin v. Hospira, Inc.,* 762 F.3d 552, 559 (7th Cir. 2014), the Court explained that formal labels of "direct method of proof" and "indirect method of proof" don't necessarily mean much. Ultimately a plaintiff can rely

42

upon direct evidence or circumstantial evidence no matter how they are attempting to proceed. *Id.*

These cases are instructive because they teach that rigid adherence to the different employment discrimination tests lead to flawed results on motions for summary judgment. The real question should be whether a jury, if it was permitted to do so, could conclude that the actions of the employer could constitute retaliation.

## C. There are sufficient facts to support Gholami's substantive Title VII claims

Gholami alleges two substantive claims under Title VII, national origin and gender. Title VII of the Civil Rights Act of 1964 makes it unlawful for employers to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As UIS correctly notes in its brief, the analysis of the two legal claims is the same. She can use a variety of different types of evidence to stave off summary judgment. *See Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 763 (7th Cir. 2016), *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005).

UIS argues that under *McDonnel Douglas*, Gholami can't establish a prima facie case. In doing so, it ignores the flexible approach of that analysis. The *McDonnell Douglas* framework is often integrated with other analytical approaches to assess discrimination claims comprehensively. Recently, in *Napier v. Orchard School Foundation*, the court aligned the *McDonnell*

43

*Douglas* analysis with the *Ortiz* assessment of evidence, indicating that both approaches are merely convenient ways to organize thoughts in deciding whether a reasonable factfinder could conclude that a plaintiff's protected characteristic caused an adverse employment action. *Napier v. Orchard School Foundation,* --- F.4th ---- (2025).

Circumstantial evidence that can support a claim of employment discrimination includes (1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action. *Darchak v. City of Chi. Bd. of Ed.,* 580 F.3d 622, 630 (7th Cir. 2009); *Hobgood v. Illinois Gaming Bd.,* 731 F.3d 635, 644 (7th Cir. 2013).

UIS obfuscates the essence of Gholami's claim to suggest that she was not hired. Clearly she was hired. Title VII goes further and prohibits discrimination as to the terms and conditions of employment. This is what she is arguing. Specifically, she maintains she was not given the role of a full professor. There is no dispute that Gholami sought that role and no dispute that it wasn't given to her. Bhatacharya attempted to justify it by falsely claiming that UIS policy didn't allow for it. The question becomes could a jury reasonably conclude that she was passed over for discriminatory reasons.

When an employer offers a justification for its actions, the prima facie case can be skipped and the analysis proceeds to the pretext inquiry. *Napier v.*

*Orchard School Foundation*, --- F.4th ---- (2025), *Everroad v. Scott Truck Sys., Inc.,* 604 F.3d 471, 477-78 (7th Cir. 2010). Here, Bhatacharya provided a justification for not giving her the title of full professor. He contends that UIS policy did not allow it. This is not true.

Once a defendant comes forward with a justification for its actions, it is incumbent upon a plaintiff to present evidence that the justification is a pretext. Pretext does not require that plausible facts presented by the defendant not be true, but only that they not be the reason for the employment decision. *See Hasham v. California State Board of Equalization*, 200 F.3d 1036, 1045 (7th Cir. 2000). A fact finder may also base a finding of pretext on a decision-maker's testimony if that testimony is internally inconsistent or contradicts other aspects of the employer's case. *Perferti v. First National Bank of Chicago*, 950 F.2d 449, 456 (7th Cir. 1991).  A plaintiff can establish pretext in an employment claim by showing that the Defendant's justifications are: (1) factually baseless; (2) not the actual motivation for the adverse action; or (3) insufficient to motivate the adverse action.  *See Tincher v. Wal-Mart Stores*, 118 F.3d 1125, 1130 (7th Cir. 1997).

It is well established that it is sufficient for a plaintiff to present evidence from which the trier of fact could simply choose to disbelieve the justifications offered by the defendant for its actions. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 725-26 (7th Cir. 2005). In analyzing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 519 (1993), the Seventh Circuit explained:

> Implicit in the Supreme Court's holding [in *Hicks*] is the notion
> that once the employee has cast doubt on the employer's proffered

45

reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury - - not the court. *Weisbrot v. Medical College of Wisconsin*, 79 F.3d 677, 681-82 (7th Cir. 1996); *see also Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1046 (7th Cir. 1999); *Reeves v. Sanderson Plumbing Products, Inc.*, 120 S.Ct. 2097, 530 U.S. 130, 147 L.Ed.2d 105 (2000).

Quite simply, pretext may be shown when there is evidence from which "a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes summary judgment." *See O'Neal v. City of New Albany*, 293 F.3d 998, 1005 (7th Cir. 2002); *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995). This point was reiterated recently by the Seventh Circuit in *Runkel v. City of Springfield*, 51 F.4th 736, 745 FN 3 (7th Cir. 2022).

In *Dister v. Continental Group, Inc.,* 859 F.2d 1108 (2d Cir. 1988), the Second Circuit thoughtfully explained the rationale behind the notion that if a finder of fact chooses to disbelieve a defendant's proffered explanation discrimination can be inferred as follows:

> The *McDonnell Douglas* system of proof, . . . , is premised on the empirical observations that (1) employers generally act for a reason, and (2) those who can demonstrate no legitimate reason for acting more likely than not acted for a discriminatory reason. Yet when the employer's nondiscriminatory reason is shown to be unworthy of belief, and could not therefore have been the real cause, the employer has in substance failed to articulate a valid explanation for discharging an employee and, moreover, has placed its credibility into question. In the context of a trial, if the plaintiff convinces the trier of fact that it is more likely than not that the employer did not act for its proffered reason, then the employer's decision remains unexplained and the inferences from the evidence produced by the plaintiff may be sufficient to prove the ultimate fact of discriminatory intent. 859 F.2d at 1113.

46

The Seventh Circuit has succinctly explained "summary judgment is proper where no rational fact finder could believe that the employer lied about its proffered reasons for [its employment action]." *Weisbrot v. Medical College*, 79 F.3d 677, 682 (7th Cir. 1996). In *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011), the Court explained that while Title VII does not require employers to have "just cause" for sacking a worker, "an employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination." *See also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 146–49, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005), the Court explained that summary judgment in an employment discrimination is appropriate only when a jury would "compelled to believe [the employer's] explanation." The Court further explained that summary judgment can be avoided when the plaintiff can point "to specific facts that place the employer's explanation in doubt." *Id*. A jury could certainly look at the justification here and find them to be not worthy of belief.

UIS' brief largely ignores the justifications it offered for not bringing Gholami back as a full professor. Given that they are true, it is understandable why they would ignore them. Bhattacharya contends that UIS policy did not allow for her to be brought back because she had to have been employed as an Associate Professor at UIS for at least six years. This is plainly not true. The policy requires that Gholami serve for six years as an associate professor at UIS *or a*

*comparable institution* and have completed two years of full-time continuous service at the University in the rank of Associate Professor. Bhattacharya conveniently ignored a portion of the rule. Here, Gholami met all the qualifications. She had served as an Associate Professor at UIS and at a comparable institution (in fact a higher ranked institution) for more than six years and had more than two years of service at UIS. By offering a justification that is not true, a jury could reasonably conclude that UIS is lying and thus find it discriminated against Gholami.

Not only did Gholami meet all of the requirements, her teaching was top notch. Papini acknowledged this as did all of the other documentation UIS prepared. She was also the most cited professor in the entire College. Her scholarship and teaching were both exceptional and objectively better than that of her colleagues.

While standing alone it would be enough, this, of course, is not the limit of the evidence Gholami has to offer. She is comparable to Artul Argawal who was made a full professor with less experience than she had. Further, Batacharya clearly was reluctant to hire her and only did so at Papini's insistence. The Department, while ultimately it voted in her favor, clearly expressed concerns about her return because she had not been happy when she was there originally. Of course, she was not happy because she had been discriminated against. When an employer engages in "fishy" behavior they run the risk of a jury not believing them. *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022); *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011).

**D. There is sufficient evidence from which a jury could reasonably conclude that Gholami was retaliated against**

In addition to its prohibition against discrimination, Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a).

Gholami's retaliation claim is that she complained about Hadidi's sexual harassment and when she returned to UIS she was not returned as a full professor.

In *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016), the Seventh Circuit explained that there are different ways to establish a claim of retaliation under Title VII. One of these methods is for a plaintiff to show that: (1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the two. *See also Malin v. Hospira, Inc.,* 762 F.3d 552, 558 (7th Cir. 2014); *Culver v. Gorman & Co.,* 416 F.3d 540, 545 (7th Cir. 2005). A plaintiff may "also supply the causal link through circumstantial evidence from which a jury may infer intentional discrimination." *Stephens v. Erickson,* 569 F.3d 779, 787 (7th Cir. 2009). "If [a] plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for

49

the defendant is not appropriate." *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013).

In *Malin* the Court presented the summary judgment question to be whether the evidence presented would allow – not compel – a jury to find in favor of the plaintiff. If so, summary judgment was not appropriate. Only when it was clear that no jury could find in favor of the plaintiff was it proper to grant the motion for summary judgment.

UIS acknowledges that Gholami engaged in protected activity. It denies that there was an adverse employment action of any kind. This, of course, is preposterous. For a retaliation claim, an adverse employment action is that which would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). *Giese v. City of Kankakee,* 71 F.4th 582, 590 (7th Cir. 2023). She was not given the role of full professor. This would have been a higher title and more money.

UIS next argues that there is no evidence that the decision was retaliatory. In *Culver v. Gorman,* 416 F.3d 540, 547 (7th Cir. 2005), the Seventh Circuit explained that while clearly courts do not sit as super personnel departments, the question is not whether the employee did something wrong but whether that is the true reason why an employer has acted. In other words, the Court explained, "Summary judgment is appropriate only if a reasonable fact finder would be compelled to believe [Defendant's] explanation." *Id.* Like most cases, this is not a case where there is some type of smoking gun evidence that

50

establishes that Blackwell's termination was retaliatory. *See Baines v. Walgreen Co.,* 863 F.3d 656, 661 (7th Cir. 2017)(explaining that "[d]irect evidence, such as an admission by the employer of unlawful animus, is sufficient but rare.").

It is well established that it is sufficient for a plaintiff to present evidence from which the trier of fact could simply choose to disbelieve the justifications offered by the defendant for its actions. *See Rudin v. Lincoln Land Community College*, 420 F.3d 712, 725-26 (7th Cir. 2005). Gholami clearly has done this.

**E. UIS is not entitled to judgment on its affirmative defense**

As an affirmative defense UIS contends that Gholami failed to mitigate her damages. Generally, "a discharged employee must mitigate damages by using reasonable diligence in finding other suitable employment." *Graefenhain v. Pabst Brewing Co.,* 870 F.2d 1198, 1202 (7th Cir.1989). Any back-pay award to a victim of discrimination must, therefore, be reduced by "[i]nterim earnings and amounts earnable [by the employee] with reasonable diligence." 42 U.S.C. § 2000e–5(g)(1). Once a plaintiff has established the amount of damages she claims resulted from her employer's conduct, the burden of going forward shifts to the defendant to show that the plaintiff failed to mitigate damages or that damages were less than the plaintiff claims. *Gaddy v. Abex Corp.,* 884 F.2d 312, 318 (7th Cir. 1989). For an employer to establish its affirmative defense that the employee failed to mitigate her damages, it must show that (1) the plaintiff failed to exercise reasonable diligence to mitigate her damages and (2) there was a reasonable likelihood that the plaintiff might have found comparable work had she exercised reasonable diligence. *Id.*

51

*Even if it could be assumed that Runkel didn't exercise reasonable diligence to obtain comparable employment, the City's mitigation argument would fail. In U.S. E.E.O.C. v. Gurnee Inn Corp.,* 914 F.2d 815, 818 (7th Cir. 1990), the Seventh Circuit highlighted that merely establishing a failure to seek alternative work was insufficient. Rather, the Court explained that a defendant must also prove the second prong that there were comparable jobs available. *Id.* In that case, the Court rejected the mitigation defense because the employer offered no evidence "concerning the availability of comparable jobs." *Id.*

In *Gracia v. Sigmatron Int'l, Inc.,* 130 F. Supp. 3d 1249, 1257 (N.D. Ill. 2015), the Court addressed this same issue. There, the Court never addressed the first prong of the mitigation defense and proceeded straight to the second. In rejecting the employer's argument, the Court explained:

> Sigmatron offers *no* evidence on the availability of work comparable to her lost position in the months after her discharge. For instance, Sigmatron could have submitted evidence about Gracia's application process with her new employer (she got that job in 2010), such as how long the position was open when she applied (and how many positions of that type were open at the new employer), and how quickly she was able to secure that position, to create *some* circumstantial basis to think that comparable work was available to her had she looked sooner. Or Sigmatron could have introduced Bureau of Labor Statistics studies for manufacturing jobs in Illinois for the relevant time period. But Sigmatron submitted no evidence on this point, so it has failed to meet its burden. It bears remembering that it is appropriate to place the burden of proof on the employer to tamp-down damages because the only reason why this question needs an answer is that the *employer* has engaged in illegal discrimination. *Id.*

Given that it has the burden on this issue, UIS offers no evidence to support its affirmative defense. The suggestion that Gholami could have subsequently been promoted, if anything, would limit her damages but not preclude them. Even if she was promoted one month later there would still have been damages. More tellingly, Bahtacharya told her that she would not be considered for promotion until 2023-2024 at the earliest. Doc. 22-3.

**CONCLUSION**

There are questions regarding UIS' true motivation not to offer Gholami the full professorship. A jury must decide this question and the motion for summary judgment must be denied.

*Roghieh Gholami*

Dated:    MAY 27, 2025

/s/ John A. Baker

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:      (217) 522-3445
Facsimile:      (217) 522-8234
Email:      jab@bbklegal.com

## CERTIFICATE OF SERVICE

This document was filed with the Court on the 27th day of May 2025 using the Court's ECF system. A copy of this filing will automatically be sent to all parties and counsel of record.

Roghieh Gholami

By:  /s/ John A. Baker
Her Attorney

John A. Baker
Baker, Baker & Krajewski, LLC
415 South Seventh Street
Springfield, Illinois 62701
Telephone:    (217) 522-3445
Facsimile:    (217) 522-8234
Email:        jab@bbklegal.com

## CITATIONS

Ghoalmi has attached several exhibits to this brief. All citations to Doc. ___ are a reference to a specific docket entry. All references to an exhibit are to the exhibits Ghoalmi is filing with this brief.  Exhibits 1-3 are portions of discovery documents produced by Ghoalmi during discovery. All references to the page numbers are a reference to the batestamp and not the page number assigned by the Clerk. Exhibit 4 are portions of exhibits tendered by UIS during discovery. Exhibit 5 is the deposition transcript of Tei-Wei Wang. Exhibit 6 is Gholami's sworn attestation.

54